436 A.2d 170

COMMONWEALTH of Pennsylvania, Appellant,

v.

**Paul NAZAROVITCH.**

COMMONWEALTH of Pennsylvania, Appellant,

v.

**Robert WHITELEATHER.**

COMMONWEALTH of Pennsylvania, Appellant,

v.

**William D. DECKER.**

Supreme Court of Pennsylvania.

Argued Sept. 14, 1981.

Decided Oct. 29, 1981.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Pittsburgh, for appellant.

Gary B. Zimmerman, Pittsburgh, for Nazarovitch.

John L. Doherty, Pittsburgh, for Whiteleather.

John T. Bender (court-appointed), Pittsburgh, for Decker.

Norma Chase, Pittsburgh, for amicus curiae Society for Investigative and Forensic Hypnosis.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

This case raises the novel issue of whether hypnotically-refreshed testimony is admissible in a criminal trial when the witness has no present recollection of the facts prior to the hypnosis. For the reasons which follow, and because of the facts peculiar to this case, we find the trial court properly exercised its discretion in suppressing the testimony of the witness in question.

On the morning of September 18, 1976, twelve-year-old Heidi Morningstar of Ambridge, Pennsylvania, was found murdered on the front lawn of an Allegheny County home. Despite intensive investigation and interrogation of numerous suspects, the Beaver County police discovered no clues to the unsolved crime. Three years to the day of the murder, Pamela Wilfong entered the Ambridge police station and informed Chief George Kyragyros that she had been experiencing nightmares about Heidi Morningstar and felt that she might know something about the murder. Prior to that day, Ms. Wilfong had been interviewed several times about the murder but had never provided significant information concerning the crime.

Chief Kyragyros immediately informed her not to say anything more until he contacted Beaver County Detective Louis Marshionda. Detective Marshionda arrived at the Ambridge police station a short time later, and Ms. Wilfong reiterated her feelings concerning the Morningstar murder. The detective and Chief Kyragyros then asked Ms. Wilfong if she would voluntarily meet with a hypnotist who would attempt to hypnotically refresh her memory. Ms. Wilfong acquiesced in their request and thereafter left the police station without any further interrogation. Two days later, Ms. Wilfong was accompanied by the detective and Chief Kyragyros to the office of Dr. Russell Scott, a licensed psychologist with extensive experience in therapeutic and investigative hypnosis. When they arrived, Chief Kyragyros spoke privately with Dr. Scott and briefly explained the

facts surrounding the crime. Dr. Scott then spent approximately one-half hour alone with Ms. Wilfong and proceeded to hypnotize her. Chief Kyragyros and Detective Marshionda subsequently entered the doctor's office and remained throughout the hypnotic session, occasionally passing written questions to Dr. Scott for him to relate to Ms. Wilfong. They adjourned for lunch and then continued the session for the rest of that day. Five days later, Dr. Scott conducted another hypnotic session with Pamela Wilfong and the same parties were present. Although no notes were taken of the sessions, tape recordings were made.

On September 28, 1979, Ms. Wilfong gave a statement to the Beaver County District Attorney. The Allegheny County authorities, who had been involved in the investigation of the Morningstar murder, were thereafter notified of the emergence of a witness in the case. Detective Francis Murphy of the Allegheny County Police interviewed Ms. Wilfong and decided that another hypnotic session might provide additional information and clarify certain details. On October 12, 1979, Ms. Wilfong was again hypnotized by Mr. George Gimigliano, a self-styled "master hypnotist." Before the session began, Detective Murphy provided Mr. Gimigliano with a copy of the statement that Ms. Wilfong had given to him. Detective Murphy and Chief Kyragyros were present during this last hypnotic session, and in fact conducted some of the questioning of the witness.

On the basis of her hypnotically-refreshed recollection, Ms. Wilfong testified at the preliminary hearing on October 30, 1979, concerning the facts of the crime. As a result of her testimony alone, Paul Nazarovitch, Robert Whiteleather, and William Decker were held for court on the charges of Criminal Homicide, Kidnapping, and Conspiracy.

■ Appellees informed the prosecution that they intended to attack the credibility of the Commonwealth's main witness. Rather than select a jury, begin the trial, and then confront the defense challenge to her testimony, the Commonwealth agreed to a pre-trial hearing on the competency of Pamela Wilfong. Testimony and argument were heard

on June 11–18, 1980. By Order of Court of July 25, 1980, appellees' motion to suppress the testimony of Pamela Wilfong was granted. The Commonwealth thereafter filed this appeal.[1]

The Commonwealth argues that hypnosis must be viewed as simply another method of refreshing a witness' recollection in that it accomplishes the stimulation of a latent memory just as the more traditional aids of memoranda and document do.

 The use of writings or business records to refresh forgotten memories has long received approval and legal recognition in this Commonwealth. *Dodge v. Bache*, 57 Pa. 421 (1868), *First Nat'l Bank of DuBois v. First Nat'l Bank of Williamsport*, 114 Pa. 1, 6 A. 366 (1886), *Nestor v. George*, 354 Pa. 19, 46 A.2d 469 (1946); *Commonwealth v. Woods*, 366 Pa. 618, 79 A.2d 408 (1951), *Commonwealth v. Canales*, 454 Pa. 422, 311 A.2d 572 (1973), *Commonwealth v. Weeden*, 457 Pa. 436, 322 A.2d 343 (1974). However, any means by which evidence is scientifically adduced must satisfy the standard established in *Frye v. United States*, 293 F. 1013 (D.C.1923), which is generally accepted by many jurisdictions, including our own. In *Frye*, the court opined:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*" *Frye v. United States, supra* at 1014. (emphasis supplied).

1. We assume jurisdiction of this case pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S. § 722, the Order of July 25, 1980 being deemed a final order in light of *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963) and *Commonwealth v. Kunkel*, 254 Pa.Super. 5, 385 A.2d 496 (1978).

Therein, the court held that the results of a polygraph test were inadmissible because the defense had not established that the machine was generally accepted in the scientific community as a reliable indicator of one's veracity. We adopted this standard in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), when we ruled that spectrograms had not yet received general acceptance of their validity by those scientists active in that field. Consequently, evidence of the defendant's voiceprint was found to be inadmissible.

One proffered rationale for this standard is "fear that the trier of fact will accord uncritical and absolute reliability to a scientific device without consideration of its flaws in ascertaining veracity." Spector and Foster, "Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?", 38 Ohio L.J. 567, 583 (1977) (hereinafter "Spector and Foster"). We believe this same standard should be applied in resolving the question now before us of whether hypnotically-refreshed testimony is generally accepted in the scientific community as yielding reasonably reliable results.

In order to determine whether hypnosis is a reliable and trustworthy evidentiary device whereby memory can be sufficiently and adequately refreshed, it is necessary to understand the phenomenon of hypnosis. Although the use of hypnosis dates back to ancient times, the scientific community began to view the subject with less scepticism and a more discerning eye after World War II. Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal.L.R. 313, 317–320 (1980) (hereinafter "Diamond"). In fact, hypnosis has become "a powerful medical technique that is useful as an anesthetic, in the treatment of various forms of mental illnesses, and in the treatment of amnesia." Spector and Foster, *supra* at 570. The main application of hypnosis today is for psychotherapeutic purposes by a minority of psychiatrists.[2] Diamond, *supra* at 320, Spector and Foster, *supra* at 579.

Although experts disagree about many aspects of hypnosis, all concur that hypnosis is a sleeplike state whereby

**2.** The medical use of hypnosis was approved by the American Medical Association, 168 J.A.M.A. 186–187 (1958).

response to stimuli is more easily achieved than in a waking state. 11 *Encyclopedia Brittanica,* Hypnosis, 995–997 (1973). Spector and Foster, *supra.* Categorized as a state of heightened concentration, hypnosis is achieved by creating a passiveness in the subject, usually by employing eye fatigue. The subject, with increased receptivity to instruction, is guided into a trance-like state through a series of suggestions from the hypnotist. The hypnotized subject can be regressed to past times and places and recount the emotions and events experienced then. For this purpose, hypnosis has been utilized by prosecution and defense alike to stimulate recall on the part of a victim or potential witness whose memory concerning a particular situation has, for whatever reason, failed.

In order to discuss the degree of acceptance of hypnosis among members of the scientific community, it is necessary to distinguish the medical use of hypnosis from that use which the Commonwealth promotes herein.

"The clinical use of hypnosis is very different from the forensic use. The police officer is concerned with establishing facts. Psychiatrists and psychologists use hypnosis in an effort to alleviate distress. Hypnosis helps to build a trusting relationship between doctor and patient which is important in the treatment process. It can help the patient to work out symptoms even though his or her beliefs about his or her illness are entirely erroneous. Dentists, obstetricians, and anesthesiologists use hypnosis entirely for the control of pain."

Levitt, "The Use of Hypnosis to 'Freshen' the Memory of Witnesses or Victims," *Trial,* April, 1981, at 56, 58. (hereinafter "Levitt").[3] While psychologists and psychiatrists may find hypnosis helpful in the pursuit of medical treatment or cures, it is for the very reasons outlined above that the scientific community expresses grave misgivings about the forensic use of hypnosis.

---

**3.** Dr. Eugene Levitt is the director of psychology in the Department of Psychiatry and a professor of clinical psychology at Indiana University School of Medicine. He is also president of the division of psychological hypnosis of the American Psychological Association.

Two important characteristics of a subject in a hypnotic trance are hypersuggestibility and hypercompliance. *Id.* at 56. A hypnotic subject has a reduced perception of reality, an alteration in consciousness, and a heightened sense of concentration and suggestibility. Spector and Foster, *supra* at 580. The subject's increased compliance stems from the feelings of a close relationship as promoted by the hypnotist to insure cooperation. Note, "Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony," 38 Wash. & Lee L. R. 197, 200 (1981). (hereinafter "Safeguards").

"Thus, the hypnotized individual is not only more easily influenced but is also more highly motivated to please others, most especially the hypnotist and those who are seen as associated with the hypnotist."

Levitt, *supra* at 56. See also, Dilloff, "The Admissibility of Hypnotically Influenced Testimony." 4 Ohio Northern L.R. 1 (1974). (hereinafter "Dilloff").

Consequently, the subject may intercept and internalize any suggestions about the desired answer. The fact that the subject is eager to please the hypnotist does not imply that the subject would knowingly fabricate facts. However, in most cases involving forensic hypnosis, the subject is aware that the reason for the hypnotic session is an inability on his part to remember facts. A subject's awareness of the purpose of the hypnotic session, coupled with the hypersuggestibility which the subject experiences, amounts to a situation fraught with unreliability. Even when the hypnotist consciously attempts to avoid emitting signals, the problem may not be avoided. The hypnotic individual need not receive direct suggestions in order to try to please the hypnotist. Levitt, *supra* at 57. "The attitude, demeanor, and expectations of the hypnotist, his tone of voice, and his body language may all communicate suggestive messages to the subject." Diamond, *supra* at 333.

In addition to responding to conscious or unconscious suggestions from the hypnotist, a subject in a state of hypersuggestibility and hypercompliance will unconsciously create answers to the questions which the hypnotist asks if

he cannot recount the details being sought. This process of filling the gaps of memory with fantasy is called confabulation. Safeguards, *supra* at 200, n. 23, citing E. Monaghan, *Hypnosis in Criminal Investigation* 86 (1980). See also Dilloff, *supra;* Diamond, *supra* at 335.

> "Thus, the hypnotically recalled memory is apt to be a mosaic of (1) appropriate actual events, (2) entirely irrelevant actual events, (3) pure fantasy, and (4) fantasized details supplied to make a logical whole."

Diamond, *supra.*

While the historical accuracy of recall may not be significant for psychotherapy purposes, it is the very quality at stake in the controversy surrounding forensic hypnosis. Furthermore, the hypnotic subject, upon awakening, is often imbued with a confidence and conviction as to his memory which was not present before. Prehypnosis uncertainty becomes molded, in light of additional recall experienced under hypnosis, into certitude, with the subject unaware of any suggestions that he acted upon or any confabulation in which he engaged. The subject's firm belief in the veracity of his enhanced recollection is honestly held, and cannot be undermined through cross-examination. As one learned scholar observed, "The nature of hypnosis is such that the subject's critical judgment is suspended and he responds to the demand for exact, photographic recall even when his actual recall is vague and doubtful." Diamond, *supra* at 340. See also Levitt, *supra* at 57.

For the above reasons, i. e. the heightened suggestivity, the increased desire to satisfy the hypnotist, the tendency to confabulate, and the inability to distinguish in one's waking state the fact from the fantasy, some members of the scientific community hold the view that criteria have not yet been developed whereby the accuracy of hypnotically-adduced testimony can reasonably be assured. "Most authorities agree that a general rule of reliability of the veracity of statements elicited during hypnosis cannot be formulated." Spector and Foster, *supra* at 583. Dr. Bernard L. Diamond, a clinical professor of psychiatry at the University of California, San Francisco, and a professor of law at the Univer-

sity of California, Berkeley, contends that hypnotically-refreshed memory is not reliable and should be excluded as inadmissible as a matter of law. Diamond, *supra* at 349.

Over the past two decades, many jurisdictions have been confronted with the problem of determining the admissibility of hypnotically-refreshed testimony.[4] Numerous states have permitted the introduction of hypnotically-induced testimony, ascribing to the trier of fact the duty of weighing the reliability of the evidence. See *Harding v. State*, 5 Md.App. 230, 246 A.2d 302, cert. den. 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), *State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312 (1971), *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974), *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978), *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979), *Clark v. State*, 379 So.2d 372 (Fla.App. D1, 1979), *Temoney v. State*, 45 Md.App. 569, 414 A.2d 240 (1980), vacated on other grounds, 290 Md. 251, 429 A.2d 1018 (1981), and *Merrifield v. State*, 400 N.E.2d 146 (Ind.1980). In the above-cited cases, the courts permitted the introduction of testimony by witnesses and victims who had undergone pretrial hypnosis to stimulate recall. In several of these cases, the court ruled that the witness' testimony was not tainted by the hypnotic session because the witness had either related the principal facts of the crime or identified the defendant prior to hypnosis, *Creamer v. State, supra, Merrifield v. State, supra*, or the court avoided the real issue by finding that the witness testified from restored memory alone. *State v. McQueen, supra*. In another case, the expert testimony of the hypnotist assured the court of the reliability of the process and the freedom from suggestion with which the hypnotic session was conducted. *Harding v. State, supra*.

Nonetheless, courts continued to be concerned about the reliability of hypnotically-refreshed memory, the possibility of bias or suggestion in the hypnotic procedure, and the probability of juries attaching undue weight to such testimony. See Safeguards, *supra* at 206; Note, "Probative Value

4. For a complete discussion of all relevant case law on this subject, see Annot., 92 A.L.R.3d 442 (1979).

of Testimony from the Hypnotically Refreshed Recollection," 14 Akron L.R. 609, 614 (1981) (hereinafter "Probative Value"). The first court to seriously respond to the frailties inherent in the use of hypnotically-refreshed testimony was the Supreme Court of New Jersey in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981). Therein, the court announced:

"[T]estimony enhanced through hypnosis is admissible in a criminal trial if the trial court finds the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory."

*Id.* at 543, 432 A.2d at 95. However, the court adopted strict procedural safeguards which must be met before hypnotically-refreshed recollections may be admitted. First, an independent psychiatrist or psychologist, not regularly employed by the prosecution or defense, should conduct the interview. Second, any information transmitted to the hypnotist concerning the case must be recorded in some manner. Third, the hypnotist should derive as detailed a statement as possible from the witness prior to induction. Fourth, all meetings between the hypnotist and subject must be recorded. Finally, only the hypnotist and the subject should be present during the hypnotic encounter.

In formulating these guidelines, the court recognized the problems raised by numerous experts concerning the use of hypnosis and the possible contamination of a witness' memory. The court acknowledged that:

"[a] subject often will incorporate into his response his notion of what is expected of him. . . . Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues.

\*　　\*　　\*　　\*　　\*　　\*

"Perhaps [the] most troubling phenomenon is the tendency to confound memories evoked under hypnosis with prior recall.

\*　　\*　　\*　　\*　　\*　　\*

"Typically, a subject is told he will remember what he has recalled under hypnosis after he awakes from the trance.

In response to this post-hypnotic suggestion, most subjects will indiscriminately mix their hypnotic recall with their waking memory. Many experts believe that the subject is then unable to evaluate critically the resulting memory to determine what he himself believes is the accurate version. . . . Furthermore he will have a strong subjective confidence in the validity of his new recall, which will make it difficult for an expert or a jury to judge the credibility of his memory." (citations and footnotes omitted.)

*Id.* at 539, 432 A.2d at 93. In spite of these significant stumbling blocks in the reliability of hypnotically-induced recollection and in spite of expert testimony that hypnosis could not ensure the accuracy of a subject's recall, the New Jersey Supreme Court chose to permit the introduction of testimony so adduced.[5]

The court, in not demanding that hypnosis be generally accepted as a method of reviving historically accurate recall, justified its decision by noting that unrefreshed eyewitness testimony was subject to similar shortcomings. *Id.* at 540, 432 A.2d at 94. The court concluded, with ample authority, that information from witnesses who testify from their memory share many of the same defects as hypnotically-induced testimony, including unconscious confabulation, suggestions emanating from the interrogator, subtle distortions of memory and false confidence. *See generally* Marshall, Marquis & Oskamp, "Effects of Kind of Question and Atmosphere of Interrogation on Accuracy and Completeness of

---

**5.** Dr. Martin T. Orne, a foremost clinical and research expert on hypnosis, testified for the defense. He is a professor of psychology and the director of the Institute for Experimental Psychiatry at the University of Pennsylvania as well as editor of the International Journal of Clinical and Experimental Hypnosis. Dr. Orne testified that hypnotic recall is often unreliable by reason of the factors inherent in the nature of hypnosis. While hypnosis may somewhat improve a subject's ability to recall past events, there is an inherent possibility that the subject's statements could constitute intentional lies, confabulations, or fantasies. Dr. Orne cautioned that if hypnotically-refreshed memory is to be used in court, at least certain safeguards should be observed. See *State v. Hurd*, 173 N.J.Super. 333, 414 A.2d 291 (1980) for a complete summary of the expert testimony presented in this case.

Testimony," 84 Harv.L.Rev. 1620 (1971); Levine & Tapp, "The Psychology of Criminal Identification," 121 U.Pa.L. Rev. 1079 (1973); Note, "Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification," 29 Stan.L.Rev. 969 (1977). Consequently, the court expressed a belief that the adversary system, designed to disclose the inherent weaknesses of evidence to a jury, could likewise reveal the shortcomings of hypnotically-adduced testimony. Permitting a party to challenge the reliability of any particular procedures followed in the acquisition of hypnotically-refreshed testimony insured, in the mind of the New Jersey court, sufficient opportunity for a party to argue to the jury how much weight to accord such testimony.

Herein, the Commonwealth urges us to adopt the thinking and the procedural safeguards enunciated by the *Hurd* court. The fact that pre-trial hypnosis was used to refresh the memory of a witness goes only to the weight of the evidence, argues the prosecution, and not to its admissibility. However, at this time, we remain unconvinced that the trier of fact could do anything more than speculate as to the accuracy and reliability of hypnotically-refreshed memory. The *Hurd* court's rationale that hypnotically-refreshed recollection might as well be admissible since ordinary eyewitness accounts are also vulnerable to error and inaccuracies does not do full justice to the fact that "the traditional guaranties of trustworthiness as well as the jury's ability to view the demeanor of the witness are wholly ineffective to reveal distortions of memory induced by the hypnotic process." Probative Value, *supra* at 615. It is unchallenged that a jury can more critically analyze a witness' ability to perceive, remember, and articulate his recollections when such testimony has not been hypnotically-refreshed. The probative worth of the hypnotically-adduced evidence cannot overcome the serious and fundamental handicaps inherent therein.

A judicial reluctance to render hypnotically-refreshed testimony admissible appears to be increasing. Recently, two courts have held that a witness who underwent pretrial

hypnosis was incompetent to testify as to the subject matter discussed at the hypnotic session. See *State v. Mack*, 292 N.W.2d 764 (Minn.1980); *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981). The Supreme Court of Arizona applied the essentials of the *Frye* test, albeit not by name, and stated:

"The determination of the guilt or innocence of an accused should not depend on the unknown consequences of a procedure concededly used for the purpose of changing in some way a witness' memory. Therefore, until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases."

*State v. Mena, supra* at 231, 624 P.2d at 1279. *See also People v. Tait,* 99 Mich.App. 19, 297 N.W.2d 853 (1980).

■ Similarly, we do not believe that the process of refreshing recollection by hypnosis has gained sufficient acceptance in its field as a means of accurately restoring forgotten or repressed memory. In this particular case, the Commonwealth introduced the testimony of two hypnotists on the reliability of hypnosis; only one of those was a psychologist with medical credentials to support his opinions. Both the Commonwealth's psychologist and a psychiatrist called by the court as an expert witness admitted that there is no truly objective scientific test for determining whether information related during a trance state is reliable.

Furthermore, the procedure involved in the hypnosis of this witness tends to impeach rather than support the integrity of the hypnotic sessions for which our approval is sought. There is no record as to Ms. Wilfong's unaided recollection prior to hypnosis. The hypnotists were both secured by the prosecution and were, in fact, assisted by police authorities in the actual questioning of the hypnotic witness. Dr. Scott had hypnotized the brother of the victim, albeit several years before he was engaged to hypnotize this witness, and Mr. Gimigliano received a full statement of Ms. Wilfong's hypnotically-refreshed testimony prior to his ses-

sion with her. In addition to the fact that all of the hypnotic encounters were riddled with suggestive possibilities and weighted in favor of the prosecution, Ms. Wilfong also revealed that she had ingested a hallucinogenic drug known as PCP,[6] as well as a small amount of marijuana, during the criminal episode. This fact is not insignificant for the quality of her recollection is dependent on the quality of her perceptions at the original time. As Dr. Trellis testified at the suppression hearing, "[i]f a person has taken PCP and all their [sic] sensory input is so altered, then I question what one will get back if the input coming in was altered in the first place." That the witness was experiencing the effects of a distorting drug offers us further assurance that this case is not the appropriate vehicle for the introduction of hypnotically-refreshed memory.

While we do not want to establish a *per se* rule of inadmissibility at this time, we will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory. We believe that the facts of this case warranted the suppression by the trial judge of this witness' refreshed testimony.

Order affirmed.

6. This acronym stands for the drug phencyclidine.