485 A.2d 795

**COMMONWEALTH of Pennsylvania**

**v.**

**Vincent ROMANELLI, Appellant.**

Superior Court of Pennsylvania.

Submitted April 2, 1984.

Filed Dec. 12, 1984.

262

Dennis B. Stephens, Media, for appellant.

Helen T. Kane, Assistant District Attorney, Media, for Commonwealth, appellee.

Before WIEAND, JOHNSON and LIPEZ, JJ.

WIEAND, Judge:

Vincent Romanelli was tried by jury and was convicted of rape,[1] unlawful restraint,[2] indecent assault,[3] involuntary deviate sexual intercourse,[4] simple assault[5] and possession of instruments of crime.[6] On direct appeal from the judgment of sentence, he contends that the trial court erred in permitting the victim's "hypnotically-refreshed" testimony to be received by the jury. We disagree and affirm the judgment of sentence.

On the morning of June 3, 1981, at or about 11:00 o'clock, Deborah Deckman was standing on the platform of the Gladstone station in Lansdowne, Delaware County, when she observed a man walking along the railroad tracks. When the man reached the station, he came upon the platform and approached Ms. Deckman. When he was within a few feet of her, he pulled out a knife and asked her if she had ever been raped. He grabbed her by the arm, placed the knife to her neck and pulled her across the parking lot to a parked vehicle. He forced Ms. Deckman into the front seat, entered behind her, again placed the knife against her throat and ordered her to undress. When she failed to respond, he removed her clothes. He compelled her to commit fellatio and, after forcing her into the rear seat, engaged in vaginal intercourse. He then threatened her with the knife and a hammer and extracted from her a promise not to report the incident. When Ms. Deckman was released, she got in her car, drove home and called the police.

Later the same day, she gave the Lansdowne police a detailed account of the crime and a description of her assailant. She said that she had been raped by a white male, approximately five feet, eight inches in height, with

1. 18 Pa.C.S. § 3121.
2. 18 Pa.C.S. § 2902.
3. 18 Pa.C.S. § 3126.
4. 18 Pa.C.S. § 3123.
5. 18 Pa.C.S. § 2701.
6. 18 Pa.C.S. § 907.

dark brown hair, dark eyebrows, very dark eyes, and an upper tooth which protruded from the right side of his mouth. She assisted a police officer in preparing a composite drawing of her attacker and later gave police a drawing which she had prepared by herself. The following day she assisted an officer of another police department in preparing another composite drawing. However, she felt that none of the drawings was entirely satisfactory. Thereafter, Sergeant Joseph Nero of the Lansdowne Police Department compiled a set of seven hundred thirty-six (736) photographs from police files by use of a "mirocode system." From a physical description of "short, fat, ruddy complexion," Nero entered into the system a corresponding code which produced photographs of individuals whose descriptions matched that represented by the code. Ms. Deckman identified none of the individuals depicted as her assailant, and the display was not preserved.

On June 8, 1981, Ms. Deckman went to the Delaware County Court House where she again gave a detailed account of the attack and a description of her assailant. She again stated that he was about 5′ 8″, had dark brown hair and a "[v]ery protruding tooth in the front[;] that's the one thing that I won't forget." "I am almost positive I would" remember him if I saw him again, she remarked. Immediately thereafter, Mr. Paul Schneider, who was employed by the Major Crimes Task Force of Delaware County, placed Ms. Deckman under hypnosis and interviewed her in an effort to extract any facts which she might previously have forgotten. No additional facts of significance, either with respect to the details of the incident or the description of the rapist, were produced.

On August 8, two months later, Ms. Deckman was shown a series of eight photographs and identified appellant as the man who had raped her. On August 12, 1981, a new array of eight photographs was prepared and contained an older photograph of appellant. Ms. Deckman again identified appellant as her assailant.

Appellant moved pre-trial to suppress all of Ms. Deckman's testimony. At the suppression hearing, the court was shown a videotape recording of the pre-hypnotic and hypnotic interviews. The court refused to suppress Ms. Deckman's testimony or her identification of appellant but did suppress all testimony "insofar as it relate[d] to those matters in the hypnotic interview which were not previously referred to or stated by her to have occurred in any statement or interview given by Deborah Lee Deckman prior to being hypnotized on June 8, 1981." Ms. Deckman testified at trial as to the events of June 3, 1981 and identified appellant as her assailant. She said that her assailant didn't have all his top teeth and had one tooth that was protruding. Appellant's mouth, with false teeth removed, was observed by the jury.

The uses to be made of hypnotically retrieved and hypnotically-refreshed testimony have been considered in several recent decisions of the appellate courts in Pennsylvania. In *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981), the Supreme Court was asked to determine "whether hypnotically-refreshed testimony [was] admissible in a criminal trial when the witness ha[d] no present recollection of the facts prior to hypnosis." *Id.*, 496 Pa. at 99, 436 A.2d at 171. After exploring the scientific data and reviewing the decisions of other jurisdictions, the Court held: "While we do not want to establish a *per se* rule of inadmissibility at this time, we will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory." *Id.*, 496 Pa. at 111, 436 A.2d at 178.

This Court followed *Nazarovitch* in *Commonwealth v. McCabe*, 303 Pa.Super. 245, 449 A.2d 670 (1982), a murder case wherein the chief Commonwealth witness, a sixteen-year-old girl, had seen the apparent murderers but could not identify them. During and after hypnosis, the witness was able to recall the identity of both men, one her brother and the other an acquaintance. Because the witness had

had no recollection of the identity of the alleged murderers prior to hypnosis, the Superior Court affirmed the suppression of her testimony.

A different result was reached by a panel of this Court in *Commonwealth v. Taylor*, 294 Pa.Super. 171, 439 A.2d 805 (1982) (allocatur denied April 7, 1982). In that case the hypnotized witness had been the victim of a brutal rape and assault. Despite death-threatening injuries, she had been able to inform police that her assailants were two men whom she had just met at a neighbor's party. She was also able to make positive identifications of her attackers from photographs *prior* to hypnosis. The Court said:

> It is clear that the victim was able to positively identify both of her assailants prior to the hypnotic session. Therefore, with respect to the victim's ability to identify her two assailants, the hypnotic session did not, in fact, refresh her memory and the dangers of unreliable suggestion, fantasy and confabulation are not at issue. With respect to what happened to the victim after she was raped, during the period in which she lapsed in and out of consciousness, our review of the entire trial transcript, suppression hearing transcript and transcript of the hypnotic session itself confirms that the prosecution deliberately did not attempt to utilize any testimony of the victim which conceivably surfaced for the first time as a result of the hypnotic session.... Therefore, the victim's testimony was not rendered incompetent by the hypnotic session due to the fact that she did have prior recollection.

*Id.*, 294 Pa.Superior Ct. at 177–178, 439 A.2d at 807.

Earlier this year the Supreme Court handed down its decision in *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984), in which the defendant had been convicted of aggravated assault and homicide by vehicle arising from a high speed chase and the striking of an automobile driven by the deceased victim. Dennis Lucas, a passenger in the decedent's car, was called as a witness by the Commonwealth. Prior to hypnosis, he had been able to recall that

the defendant's car had struck the decedent's vehicle at least twice. As a result of a hypnotic session, conducted by a county detective, Lucas was able to recall being struck by the defendant's car a third time, when their car had been forced into a telephone pole. Following its earlier decision in *Nazarovitch*, the Court held inadmissible the portion of Lucas' testimony which had emanated from hypnotically-induced "recollection." The Court went further, however, and held that "that part of Lucas' testimony which was not hypnotically adduced" could be used upon a retrial. The Court explained:

> The conscious mind when put to rest, isolated from immediate distractions and led to concentration upon a topic, may put order to information otherwise jumbled and confused. In a state induced by chemicals or concentration one may better remember things received by the senses and put them in their original sequence, however defective was their original reception.

> Placidity may indeed freshen the memory, recalling events and connections that might aid in further discovery. However, such process does not validate the impression originally received by the senses. They always remain subject to error. Neither concentration nor chemicals can supply a defect in sight or hearing. What benefits may come from hypnotism in aiding memory or discovery are different from using the product as admissible evidence.

*Id.*, 505 Pa. at 89, 476 A.2d at 1307–1308. While approving of this Court's decision in *Taylor*, the Court prescribed additional guidelines:

> [W]henever a person previously hypnotized is offered as a witness, the offering party must so advise the court, and show that the testimony to be presented was established and existed previous to any hypnotic process; that the person conducting the hypnotic session must be trained in the process and is neutral of any connection with the issue or the parties; and, the trial judge shall instruct the jury that the testimony of a witness previously hypno-

tized should be carefully scrutinized and received with caution.

*Id.,* 505 Pa. at 89–90, 476 A.2d at 1308.

Appellant's contention in this case that all of the victim's testimony should be inadmissible because of hypnosis is clearly untenable. Such a position has been expressly rejected by the Supreme Court in *Smoyer* and by this Court in *Taylor.* The wisdom of refusing to adopt a per se rule of exclusion is well illustrated by the facts of this case. Ms. Deckman, an obviously intelligent and perceptive woman, had a clear recollection of the indignities visited upon her and of the features of her assailant. All of this was recorded prior to her being placed under hypnosis. That its reliability was not diminished by suggestivity or confabulation while under hypnosis seems clear. That it rested upon actual observation rather than hypnotically induced fancy is also clear.

It is argued, however, that the identification of appellant by Ms. Deckman occurred only after she had been hypnotized. Chronologically this is correct. However, Deckman had evidenced a clear recollection of her assailant prior to hypnosis. She had described accurately and in considerable detail the features of her assailant and had expressed confidence in her ability to recognize him if she saw him or his likeness in the future. The same description had been repeated on several occasions. Indelibly impressed in her memory was the image of a 5′ 8″ white male with dark hair and eyes and a protruding tooth. Attempted composite drawings were unable to capture sufficient detail to satisfy her more accurate recollection. Although no positive identification was made prior to hypnosis, it is significant also that no misidentification was made during this time frame. The videotape of the hypnosis session disclosed that no suggestive questions had been asked and no new information regarding the appearance of the assailant had been developed. The hypnotic session neither pillared nor occluded Ms. Deckman's recollection of her rape or of the person who attacked her.

■ The decision in *Smoyer* will not be applied rigidly and mechanically. It is enough to render the victim's testimony admissible that her recollection of the facts had been established and existed prior to any hypnotic process. The hypnotic process will not per se invalidate the competency of impressions originally received by the senses. The victim of a crime who has a vivid and precise recollection of her attacker, who has observed him for a protracted period in broad daylight and possesses a clear, independent, mental image of her assailant's appearance will not be rendered incompetent to testify when she finds again the man who attacked her merely because, in the interim, she subjected herself to nonsuggestive hypnosis. *Smoyer* does not require a contrary result. See: *Simkus v. State,* 296 Md. 718, 464 A.2d 1055 (1983); *In re J.R.D.,* 342 N.W.2d 162 (Minn.App.Ct.1984); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386, *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983).

■ The *Smoyer* Court prescribed that when a person who has been previously hypnotized is offered as a witness, the Commonwealth must show that the person conducting the hypnotic session was trained in hypnosis and was neutral of any connection with the issue or the parties. Although the *Smoyer* Court did not verbalize the reason for this requirement, the Court's opinion in *Nazarovitch* is enlightening. The Court there said: " '[T]he hypnotized individual is not only more easily influenced but is also more highly motivated to please others, most especially the hypnotist' .... Consequently, the subject may intercept and internalize any suggestions about the desired answer.... [I]n most cases involving forensic hypnosis, the subject is aware that the reason for the hypnotic session is an inability on his part to remember facts. A subject's awareness of the purpose of the hypnotic session, coupled with the hypersuggestibility which the subject experiences, amounts to a situation fraught with unreliability." *Commonwealth v. Nazarovitch, supra,* 496 Pa. at 104, 436 A.2d at 174. The purpose of the requirement of neutrality and

training, therefore, is to eliminate any possibility that the witness' recollection will be influenced by an unqualified or biased hypnotist, even where it is established that the testimony to be presented was existing prior to hypnosis. We view this precaution as a prudent one. However, where the hypnotic session has been tape recorded and the expertise and impartiality of the hypnotist are thereby demonstrated, this requirement has been met. This is particularly so where, as here, it is also demonstrated that the witness' recollection has been unchanged by hypnosis. Deckman's memory was positive and detailed prior to hypnosis, and remained so, with little or no change, after hypnosis. Under these circumstances, the qualifications and neutrality of the hypnotist were sufficient to justify the court's refusal to suppress the victim's testimony.

The trial court did not instruct the jury that the testimony of Ms. Deckman "should be carefully scrutinized and received with caution." However, counsel did not request such an instruction and did not object to the omission thereof.[7] The points for charge which appellant did submit were submitted untimely, immediately prior to commencement of the court's jury instructions, see: Pa.R.Crim.P. 1119(a), and consisted of abstract observations regarding the process of hypnosis having no application to the facts of the case. The trial court properly rejected them.[8]

Next, appellant complains that because the Lansdowne police did not preserve the mirocode display of 736 photographs from which Ms. Deckman was unable to choose a suspect it was impossible to determine whether appellant's picture had been included. We agree that had appellant's picture there appeared, Ms. Deckman's failure to identify it would have been relevant in determining the

7. It will be obvious to the reader that the trial in this case preceded the decision of the Supreme Court in *Commonwealth v. Smoyer, supra.*

8. At the close of the court's instructions, appellant did not object to the court's denial of his points for charge. As to the effect of such failure, see *Commonwealth v. Russell,* 326 Pa.Super. 346, 352–353, 473 A.2d 1383, 1386 (1984) and *Commonwealth v. Rineer,* 310 Pa.Super. 241, 249, 456 A.2d 591, 595 (1983).

credibility and weight of her identification testimony. However, the Commonwealth was under no obligation to preserve a photo display which resulted in no positive identification. It is required that such a display be preserved when an identification is made to enable the defendant "to attack the credibility of the identification witness' testimony, or to have the entire identification testimony suppressed because of the impermissibly suggestive nature of the layout procedure." *Commonwealth v. Jackson,* 227 Pa.Super. 1, 10, 323 A.2d 799, 804 (1974). Where, as here, no identification has been made, the reasons for requiring retention and/or reproduction of the array are not present. Appellant's identification was not rendered incompetent because the array of 736 photographs could not be recreated and reviewed.

Finally, appellant argues that the trial court erred in denying the motion for change of venue which he filed on the eve of trial. In this motion he contended that he could not receive a fair trial in Delaware County because of media reporting of the trial held one week earlier in which he had been found guilty of raping a former nun. During voir dire examination of prospective jurors, however, only nine of fifty veniremen questioned had ever heard or read anything regarding appellant in relation to the instant case or any other matter. After voir dire had been completed, there was available a reservoir of thirty potential jurors, none of whom had ever heard or read anything about appellant.

Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. *E.g., Commonwealth v. Scott,* 469 Pa. 258, 266, 365 A.2d 140[, 144] (1976); *Commonwealth v. Hoss,* 469 Pa. 195, 199, 364 A.2d 1335[, 1337] (1976); *Commonwealth v. Kichline,* 468 Pa. 265, 273, 361 A.2d 282[, 287] (1976); *Commonwealth v. Powell,* 459 Pa. 253, [259], 328 A.2d 507[, 510] (1974); *Commonwealth v. Russell,* 459 Pa. 1, 326 A.2d 303 (1974). "In reviewing the trial court's

decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity." *Commonwealth v. Kichline, supra,* 468 Pa. at 274, 361 A.2d at 287. Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury. See *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Commonwealth v. Rolison,* [473 Pa. 261, 374 A.2d 509, *cert. denied,* 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (1977)]; *Commonwealth v. Hoss,* 469 Pa. 195, 201, 364 A.2d 1335[, 1338] (1976); *Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, [212,] *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between publicity and actual jury prejudice," *Commonwealth v. Frazier,* 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had.

*Commonwealth v. Romeri,* 504 Pa. 124, 131–132, 470 A.2d 498, 501–502 (1983), *cert. denied,* — U.S. —, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984), quoting *Commonwealth v. Casper,* 481 Pa. 143, 150–151, 392 A.2d 287, 291 (1978).

■ Appellant concedes that the evidence was insufficient to show actual prejudice but contends that the pre-trial publicity was so recent and so sensational that the community must be presumed to be inherently prejudiced against him. We disagree. "[O]nce the fact of pre-trial publicity is determined, the inquiry then turns to the nature of the publicity and its effect on the community. Factors to be considered in determining the nature of the publicity include the following:

whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of

sensational, inflammatory and 'slanted articles demanding conviction' ...; whether the pre-trial publicity revealed the existence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers."

*Commonwealth v. Romeri, supra,* 504 Pa. at 132, 470 A.2d at 502, quoting *Commonwealth v. Casper, supra,* 481 Pa. at 152–153, 392 A.2d at 292. Even the publication of prejudicial information does not require a change of venue unless "such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it." *Commonwealth v. Romeri, supra,* 504 Pa. at 134, 470 A.2d at 503, quoting *Commonwealth v. Casper, supra,* 481 Pa. at 153, 392 A.2d at 292.

In the instant case the only information regarding the prior week's trial had appeared in three daily editions of the *Delaware County Daily Times.* These editions carried factual accounts of the trial, including the testimony of the victim. On January 22, 1982, the third day's account carried appellant's photograph and a headline, "SUSPECT GUILTY OF ATTACK ON EX–NUN." The only other reference to this prior conviction was contained in an 11:00 p.m. newscast by WCAU-Channel 10 television in Philadelphia on January 21, 1982. This news report had also been factual. It was as follows:

Back home, a Delaware County jury has found a Darby man guilty of the rape of an ex-nun at Sts. Peter and Paul Cemetery in Marple Township last July. Twenty-four year old Vincent Romanelli has been convicted of raping the Haverford woman when she was placing flowers on her father's grave.

Appellant's concern that his prior conviction was potentially available to every family in Delaware County is blunted by the fact that only nine of fifty potential jurors had ever heard of him. See: *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975) (no change of venue required

where 31 of 139 prospective jurors had formed fixed opinions); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971) (no change required where 26 of 138 jurors had formed opinion). The reporting of the news media, as we have seen, was factual. It was neither extensive nor pervasive. The community had not been saturated with it.[9] It seems clear, therefore, that the trial court did not abuse its discretion in refusing to change venue on the eve of trial.

The judgment of sentence is affirmed.

9. Appellant also produced four newspaper items which had appeared in August, 1981 following his arrest. These news stories disclosed that appellant had been charged with two separate rape offenses but were otherwise factual and neither hysterical nor inflammatory. The post-arrest publicity was neither pervasive nor recent. It occurred more than five months prior to appellant's trial and its slight effect, if any, had clearly been dissipated by the lapse of time. This, too, is illustrated by the fact that only nine of fifty prospective jurors had ever heard of appellant.