682 A.2d 323

**COMMONWEALTH of Pennsylvania**

v.

**Franklin D. CRAWFORD, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 23, 1996.

Filed July 30, 1996.

Reargument Denied Oct. 11, 1996.

Preston T. Younkins, Kittanning, for appellant.

Bradley K. Hellein, Assistant District Attorney, Kittanning, for Commonwealth, appellee.

Before DEL SOLE, HUDOCK and BROSKY, JJ.

DEL SOLE, Judge.

Following a jury trial and conviction, Franklin D. Crawford appeals from the judgment of sentence imposed for murder in the second degree.[1] He was sentenced to a term of incarceration of not less than 10 nor more than 20 years. Post-sentencing motions were filed and denied. We reverse and remand.

The facts of this case were summarized by the trial court as follows:

> The Commonwealth's chief witness was one John Reed. Mr. Reed testified that on October 21 and 22, 1971, when he was 17 years old, he saw the Defendant and the victim, Pearl Altman, (also known as Pearl Cravener) together on a park bench along the Allegheny River in the Borough of Kittanning. Reed bummed a cigarette from Pearl Altman who told him she was afraid of the Defendant, (Transcript of Trial p. 60). Reed also testified that the Defendant told him if she don't give me what I want, I'm going to kill the bitch. (Transcript of Trial p. 61). Reed further testified that a short time later he again came upon the couple near a flood control dam on the river, (Transcript of Trial p. 72). At this time the victim was sitting on her rear with her eyes real big. The Defendant was sitting or squatting over the victim and jumped up when Reed approached, (Transcript of Trial p. 76). Reed testified he ran from the scene but turned and looked back to see the Defendant throwing Pearl Altman into the river, (Transcript of Trial p. 78–79).

---

1. The Penal Code was in effect in 1971 when this crime occurred; however, under the current Crimes Code, this crime would be considered murder of the third degree. 18 Pa.C.S.A. § 2502.

The witness never reported his observations until some 20 or 21 years later. He testified he never thought about the incident in the intervening years and didn't even know it existed. (Transcript of Trial pp. 83, 92, 119). In 1990 or 1991 his memory of the event was triggered when he saw a girl in a market who he thought was Pearl Cravener, (Transcript of Trial p. 83). Later his memory of the event returned to the point that he told his wife and a law enforcement officer named Daryl who referred him to state police officer James Dreyer, (Transcript of Trial p. 91).[2]

The Commonwealth introduced other evidence which corroborated parts of Reed's testimony. His testimony, however, was the only evidence linking the Defendant to Ms. Altman's death.

(Trial ct. op. filed 7–27–95 at 1–2).

Appellant submits that the trial court erred by excluding the testimony of Dr. Himmelhoch, a psychiatrist. Appellant filed a Motion in Limine to present the testimony of Dr. Himmelhoch who examined Mr. Reed to assess the nature and likelihood of his revived "repressed" memory. In his report, Dr. Himmelhoch stated that the following criteria must be present in part or in full to determine whether the memory is an accurate recovered memory rather than psychiatric confabulations, hallucinations and/or lies: 1) the truthfulness of the memory is in direct proportion to the ability of the person to remember it accurately and in detail; 2) the presence of a history of alcohol and/or drug abuse significantly detracts from reliability and adds the possibility of chemically induced memories; 3) repressed memories always exact a psychological price in terms of interval psychopathology i.e. usually anxiety symptoms such as panic attacks, social anxiety or hysterical conversions; 4) all verified cases of long-term repressed memories more than ten years are associated with massive, longer term psychic trauma such as the Holocaust and the Buffalo Creek Dam disaster; they do not occur very

[2] We note that Mr. Reed was not permitted to testify that he was diagnosed with a "repressed" memory, nor could he make any reference that he had any type of a "repressed" memory.

often after a single acute traumatic event; 5) the presence of learning disabilities and/or a low IQ strongly decreases the likelihood that returned, repressed memories are accurate; 6) character structures that are simple and impressionable are much more likely to serve as a basis for a simple, if earnest person, to become entangled in triggered ideas and to elaborate extensively.

Dr. Himmelhoch remarked that Mr. Reed admits that his everyday operating memory is very weak, and he has abused alcohol and psychedelic drugs to a degree which would disturb his memory and could cause hallucinatory activity once he became convinced of a mistaken belief. The doctor further opined that Mr. Reed has at best a borderline IQ, he experienced learning disabilities at school, and during the eighteen to twenty-two year interval when this memory was suppressed, he did not experience a significant psychiatric symptom. He also observed that Mr. Reed's character structure significantly erodes the reliability of a returned memory because he is an open and earnest person which generates a naive impressionability that would be vulnerable to repressed fantasies and that he would take the fantasies seriously. Dr. Himmelhoch concluded that Mr. Reed's repressed memory could not be considered accurate to any degree likely to obviate reasonable doubt.

The admissibility of expert testimony is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Commonwealth v. Petrovich,* 538 Pa. 369, 648 A.2d 771 (1994). Expert opinion testimony is appropriate only where the subject matter is beyond the knowledge, information or skill possessed by the ordinary juror. *Commonwealth v. Montavo,* 439 Pa.Super. 216, 653 A.2d 700, appeal denied, 541 Pa. 636, 663 A.2d 689 (1995).

> Matters of common knowledge may not be the subject of expert testimony. Further, when the matter can be described to the jury and the evidence evaluated by the jury without the assistance of one claiming to possess special expertise, expert testimony is inadmissible. Although an expert witness may testify to an ultimate issue of fact, such

testimony should be permitted *only* in those instances where the admission will not cause confusion or prejudice. Significantly, expert testimony should not invite the jury to abdicate its responsibility to ascertain and assess the facts and, instead, defer to the expert's opinion. (Citations omitted).

*Montavo,* 439 Pa.Super. 216, 653 A.2d at 705.

■ The trial court excluded Dr. Himmelhoch's testimony ruling that it bore directly on Mr. Reed's credibility, and, as such, it would have been an impermissible encroachment on the function of the jury. The trial court relied upon several supreme court cases which essentially hold that psychiatric testimony or other expert testimony concerning the credibility of witnesses is inadmissible. *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986) (Expert testimony as to the credibility of eight year old children who claim to have been objects of sexual abuse was prejudicial and inadmissible in prosecution for statutory rape and corruption of a minor, where the prosecution relied primarily upon perceived veracity of the victim to establish its case); *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988) (Expert testimony concerning effect of "rape trauma syndrome" on victim's failure to identify perpetrator two weeks after attack because of acute phase of syndrome making ordinary functions difficult, and on identification over four years later because of a flashback, improperly enhanced victim's credibility in eyes of jury, and was inadmissible); *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992) (In prosecution for sexual assault of defendant's step-daughter, expert should not have been permitted to explain why sexually abused children would delay reporting assault, might give incomplete details, and might be unable to recall dates and times of assault, as these matters are within the common knowledge of the jurors and permitting the testimony would infringe upon the jury's right to determine credibility); and *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993) (Trial court properly excluded expert opinion offered to attack the credibility of the victim because the expert's assessment that the victim's identification of defen-

dant would be suspect due to stress of attack would have provided unwarranted appearance of authority on subject of credibility which is for the juror to determine). We also realize that an expert cannot be offered to testify that the complaining witness in a particular case exhibits behavior that is consistent with the behavior patterns of victims in a certain class as this would amount to an expert assessment of the truthfulness of the witness, improperly invading the province of the jury. *Gallagher, supra; Commonwealth v. Emge,* 381 Pa.Super. 139, 553 A.2d 74 (1988); *Commonwealth v. Emge,* 381 Pa.Super. 139, 553 A.2d 74 (1988); *Commonwealth v. Ferguson,* 377 Pa.Super. 246, 546 A.2d 1249 (1988).

Although we agree with the trial court's analysis that an expert's opinion cannot be offered to attack or bolster the credibility of a witness [*Commonwealth v. Spence, supra* ], the case *sub judice* is not about attacking the credibility of the Commonwealth's witness. In this case, we are concerned with the reliability of the unique phenomena of repressed memory revived which is not ordinarily within the common knowledge of the jury. The trial court, by allowing Mr. Reed to testify for the Commonwealth, implicitly accepted the viability of the return of a repressed memory after approximately twenty years. In fact, Mr. Reed testified that not only did he not think about the events for twenty years, he did not even know that the memory existed until he saw the girl in the market whom he thought was the murder victim.

█  In the instant case, Appellant contends that the proposed expert psychiatric testimony would help the jury to evaluate the testimony of the Commonwealth's star witness who claims to have recovered a repressed memory of seeing Appellant murder the victim. Appellant submits that the information provided by Dr. Himmelhoch would not be within the "ordinary training, knowledge, intelligence and experience" of the average juror. We agree.

The average juror understands the imperfections of the human memory and how it can be affected in the regular course of experience. Unquestionably, it is within the ordi-

nary knowledge, intelligence and experience of jurors to evaluate the accuracy of the memory and the credibility of a person testifying.

The memory can be divided into three stages: perception, retention, and retrieval. At each stage, a number of factors may inject error into a person's memory.[3] The perception stage consists of a person experiencing an event which is then committed to memory.[4] In this stage, elements such as time of exposure, familiarity with the subject matter, and stressfulness of the event may affect the accuracy of the resulting memory.[5]

The retention phase of the memory process occurs following a critical event, when some information is stored in the memory, and time passes.[6] At this phase, a person is often exposed to new information which can influence the subject's recollection of past events.[7] Studies show that changes in reports as a result of postevent information is easy to induce. In some cases, people have reported objects that never existed due to information received after perception of an event.[8]

The third phase of the memory process is the retrieval of the memory. During this phase, error may be introduced into the memory due to the environment in which the memory is retrieved, the expectations created in the person's mind, the techniques used to retrieve the memory or the persons present.[9] For example, a person may see a therapist who specializes in childhood sexual abuse and the person may form assumptions about what is expected, or the therapist may

3. Ernsdorff & Loftus, *Let Sleeping Memories Lie? Words of Caution About Tolling the Statute of Limitations in Cases of Memory Repression,* 84 J.Crim.L. & Criminology 129 (1993).

4. *Id.* at 156.

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.* at 158.

engage in counseling with a bias towards recovering memories of childhood sexual abuse.[10]

The idea of a repressed memory is not a subject with which the jury would normally be familiar. "The general theory of repression holds that when an event occurs which is too shocking for the conscious mind to handle, the memory of the event is forced into the unconscious where it becomes inaccessible. The memory may stay in the recesses of the unconscious for many years, or perhaps forever, but may at some point rise up into the conscious mind."[11] Among psychologists, however, repressed memory syndrome is widely debated and many are critical of the theory. The problem with the theory of repression is that controlled laboratory experiments cannot ethically be conducted due to the traumatic nature of the circumstances thought to induce repression; therefore, without scientific proof to substantiate the theory, the subject will continue to be questioned.[12]

The perception phase of a repressed memory is similar to that of a normal memory, but not much is known about the retention or retrieval phases of a repressed memory even after sixty years of research.[13] With respect to the retention stage of a repressed memory, little is known about how and where the repressed memory is stored.[14] It is expected that repressed memories, like traditional memories, would be affected by new inputs because the recalled event occurred such a long time ago, and the evidence shows that as time passes the memory becomes malleable and susceptible to new information.[15] Because repressed memories are not consciously rehearsed like normal memories, they are clearly different. Rehearsal provides a person with the opportunity to keep a

10. *Id.*

11. Hayes, *The Necessity of Memory Experts for the Defense in Prosecutions for Child Sexual Abuse Based Upon Repressed Memories*, 32 AM. CRIM.L.REV. 69, 71–72 (1994).

12. *Id.* at 72.

13. Ernsdorff & Loftus, supra. at 133–134.

14. *Id.* at 157.

15. *Id.*

memory alive, and, when people think back in time on some previous childhood scene, the memory becomes stronger.[16] A repressed memory is not stored in that way.

Repressed memories are likely to be influenced in the retrieval stage as well. If a repressed memory is recovered after twenty or thirty years, it is more prone to new inputs, suggestive questioning and other sources of new information.[17] Until more is learned regarding the vulnerability of repressed memories, revived repressed memories, especially those recovered by suggestive therapeutic techniques, should be viewed with skepticism.[18]

In *State of New Hampshire v. Morahan*, 1995 WL 378571 (N.H.Super., filed May 23, 1995), the New Hampshire superior court addressed the issue of the admissibility of testimony of sexual assault victims who claim to have recovered the memories of the assaults through psychotherapy. The court held that the testimony of the victims of their memories of assault would not be admitted at trial because the phenomenon of memory repression, and the process of therapy used in the cases to recover the memory, have not gained general acceptance in the field of psychology and are not scientifically reliable. Even though we are not considering the admissibility of the repressed victim's testimony here, the *Morahan* court expressed several relevant points in its opinion. The court stated:

> [T]he very concept of a "repressed" memory, that is, that a person can experience a traumatic event, and have no memory of it whatsoever for several years, transcends human experience. There is nothing in our development as human beings which enables us to empirically accept the phenomenon, or to evaluate its accuracy or the credibility of the person "recovering" the memory. The memory and the narration of it are severed from all the ordinary human processes by which memory is commonly understood. To

16. *Id.* at 157–158.
17. *Id.* at 158.
18. *Id.* at 161.

argue that a jury could consider such a phenomenon, evaluate it and draw conclusions as to its accuracy or credibility, without the aid of expert testimony is disingenuous to say the least.

*Morahan, supra.*

Sixteen states allow prosecutions for child sexual abuse based upon repressed memories.[19] It has been suggested that in states where criminal prosecutions based upon a revived repressed memory are permitted, a rule requiring the admission of expert testimony on the reliability of repressed memories should be espoused for several reasons:

> Primarily, expert psychological testimony will impart to a jury or factfinder the relevant scientific information needed to make a proper evaluation of the memory evidence introduced by the State, as well as provide insight into the particular facts of the case at hand. Secondly, while cross-examination is a crucial tool for effectively litigating issues and bringing out facts in the criminal trial, it will not adequately reveal and explore the relevant empirical psychological issues inherent in any prosecution based upon repressed memory. Likewise, in the absence of expert testimony, a defense attorney's closing argument will not be able to effectively overcome possible juror misconceptions about the reliability of repressed memories if she is not able to present scientific evidence on the subject. Finally, although a jury instruction may be able to focus the jury's deliberation on the issue of the reliability of the victim's repressed memories, it would not provide data to help jurors evaluate the value of the crucial evidence. Without expert testimony on repressed memories, jurors will be denied the opportunity for the best possible understanding of the critical issue of their reliability.[20]

The expert in a criminal prosecution involving repressed memory revived could testify to several critical points for the jury. The expert could initially review the literature and

19. Hayes, supra note 51, at 78.

20. Hayes, supra at 79.

scientific history on repressed memories. The expert could explain that little is known about the repression of memories, their retrieval, and that many experts disagree as to their actual existence and the authenticity of the repressed memory once it is retrieved.[21] The expert should also generally discuss the science of memory, and state an opinion with respect to the external influences on repressed memories and the factors which may introduce error into repressed memories.[22] Another aspect that an expert could discuss is the relationship that exists between the confidence of a witness in the accuracy of the memory and the factual precision of that memory.[23] Empirical data could be introduced to illustrate that, at times, a witness can be extremely confident about inaccurate memories, and caution the jury accordingly that a confident witness is not always an accurate one.[24] The expert could also examine the circumstances surrounding the recovery of the repressed memory and explain how retrieval techniques may influence the revived memory.

Ordinarily, prior to admitting the expert testimony in a particular area, it must be determined that the subject about which the expert would testify has been "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Dunkle,* 529 Pa. at 173, 602 A.2d at 832, *citing, Commonwealth v. Nazarovitch,* 496 Pa. 97, 101, 436 A.2d 170, 172 (1981), *quoting, Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (D.C.1923) (the so-called *"Frye* standard").[25] Instantly, however, we do not reach the *Frye*

21. Ernsdorff & Loftus, supra at 172.

22. *Id.*

23. *Id.*

24. *Id.*

25. The United States Supreme Court recently rejected the *Frye* standard in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Court determined that the *Frye* standard was superseded by the Federal Rules of Evidence. The approach set forth in *Daubert* requires the trial court to determine whether the expert will testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. The

test because by the trial court's allowing the Commonwealth witness to testify about the recovered repressed memory, the court, in effect, recognized the validity of that condition. The only issue we are concerned with is whether the defense expert should have been excluded once the Commonwealth's witness testified to the recalled repressed memory.

The trial court initially should have analyzed whether, in Pennsylvania, the admission of the revived repressed memory testimony was appropriate. But, since the court failed to undertake such an analysis and accepted the witnesses' testimony, the defense expert should have been permitted to explain the concept of a revived repressed memory to the jury. Expert testimony was necessary considering the fact that the theory of repressed memory revived is a concept not within the common experience of people and continues to be vigorously debated in the field of psychology. The expert could have explained to the jurors how the memory functions and stores information, the influences on memory, the definition of repressed memory revived, the disagreement among psychologist as to the authenticity of recovered repressed memories, and the reliability of repressed memories, without commenting on the credibility of the Commonwealth's witness.

We conclude that since the trial court admitted Mr. Reed's testimony of his revived repressed memory, the trial court erred by excluding the testimony of Dr. Himmelhoch regard-

criteria that the trial court should consider in assessing whether the scientific evidence is valid and will assist the trier of fact include:

(1) whether the theory or technique can be or has been tested;

(2) whether the theory or technique has been subjected to peer review and publication (although not dispositive);

(3) whether there is a known or potential rate of error and whether there are standards controlling the technique's operation;

(4) whether the theory is "generally accepted" in the scientific community; this prong is only a factor to consider in determining admissibility and does not constitute a threshold necessity in determining admissibility;

(5) furthermore, the focus must be solely on principles and methodology, not on the conclusions that they generate.

The Pennsylvania supreme court chose not to determine whether or not the rationale of *Daubert* will supersede or modify the *Frye* standard in Pennsylvania. *See Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, n. 2 (1994).

ing the reliability of revived repressed memories. With Appellant's freedom in jeopardy, scientific evidence which could have enlightened the jury as to the reliability of recovered repressed memories should have been introduced. Appellant was entitled to a fair trial and he did not receive one in this instance.[26]

Therefore, we reverse the judgment and remand for a new trial consistent with this decision. Jurisdiction relinquished.

26. Because it is necessary to award Appellant a new trial on this claim, it is unnecessary to discuss his remaining issues in which he requests a new trial.