590 A.2d 325

**COMMONWEALTH of Pennsylvania**

v.

**Jose HERNANDEZ, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 8, 1991.

Filed April 29, 1991.

154

Joseph J. Marinaro, Philadelphia, for appellant.

Kathy Echternach, Philadelphia, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before WIEAND, MONTEMURO and HESTER, JJ.

HESTER, Judge:

Jose Hernandez appeals the January 25, 1990 judgment of sentence of two consecutive terms of life imprisonment imposed following his jury conviction of the first degree murders of four members of his family. Appellant raises numerous allegations of error by the trial court and argues that they require the grant of a new trial. We disagree; accordingly, we affirm the judgment of sentence imposed by the trial court.

The record reveals the following. Appellant's next door neighbor, Jerome Moses, testified that on March 14, 1988, he heard loud scuffling noises between 4:00 and 6:00 a.m. in the Hernandez apartment. As these noises continued, he heard Carmen Hernandez, appellant's stepmother, say three times, "I love you." He then heard three or four popping

noises that sounded like a cap gun. Subsequently, Mr. Moses did not hear any more voices, but he did hear dragging sounds and noises resembling objects being replaced. He then heard somebody leave the apartment. When he looked out of the window, he saw one man get into the Hernandez family van. Mr. Moses originally thought that the man was appellant's father, since the individual was wearing Mr. Hernandez's jacket and since only the father drove the van. Once he learned that the father was dead, the witness then concluded that the man must have been appellant.

During the next week, friends, neighbors, and relatives became concerned about the Hernandez family since they had not been seen and since both of their vehicles were not in their normal parking places. Telephone calls to the apartment were not answered. Meanwhile, appellant decided to stay at his girlfriend's house, and he told her mother that he was alone since his family suddenly left without telling him or taking him with them. However, the family had not told anyone about these travel plans. Appellant attended school regularly during the week, took his girlfriend on a shopping spree, and moved a VCR and other valuable items out of his family's apartment and into his girlfriend's house. His girlfriend commented on numerous deep scratches on appellant's chest which he explained had been inflicted during a recent robbery.

Eventually, appellant was questioned in school by his parent's friends and relatives concerning his family's whereabouts. He escorted them back to the apartment and allowed them to enter. When asked about blood stains on the sofa, appellant replied that the stains were Carmen's blood. When questioned about why the bathroom door was locked, the fan on, and a towel under the door, he had no explanation. Appellant fled when the bathroom door was broken down and the bodies of his father, stepmother, and two younger brothers were found in the bathtub. The bodies were encased in plastic bags and covered with towels. It was determined that both parents had been shot in

the back of the head, one brother had been asphyxiated with a plastic bag over his head, and another brother had his skull crushed.

Appellant fled Pennsylvania in his father's Honda. He reached Florida and then headed west through Tennessee. Tennessee State Troopers Richard Austin and Joel Deal observed appellant's Honda parked in a rest stop. Several hours later, the officers observed appellant's Honda parked in the same place at the rest stop. Trooper Austin watched appellant get out of his automobile, stretch, and put on a long coat. Since the weather was warm, Trooper Austin became suspicious. He ran a computer check on appellant's license plate number which revealed that appellant was wanted in Pennsylvania in connection with multiple homicides, that the occupant of the Honda matched the description of the suspect, and that appellant was presumed armed and dangerous. The troopers returned to the rest stop, surprised appellant in the restaurant, and arrested him.

The troopers then asked for appellant's license and identification. Police retrieved these items after appellant indicated that they were in his wallet in his back pocket. When the troopers requested the keys to the Honda, appellant indicated they were in his coat pocket. Trooper Deal reached in and took the keys and handed them to Trooper Austin. Trooper Austin inspected the car, unlocked it, and retrieved a letter sitting on the car seat in plain view. The letter was written by appellant, and in it, he informed his girlfriend that he had killed his family, was proud of it, and felt better. The troopers then locked the car, made arrangements to have it towed, read appellant his *Miranda* rights, and transported him to the nearest police station.

At trial, appellant alleged that he killed his father in self-defense and that his father continually abused him. He claimed his father was angry that appellant's stepmother again became pregnant and that his father frequently threatened to leave her or to kill the whole family. In fact, appellant alleged that his father was jealous and suspected him of impregnating his stepmother. Appellant produced

witnesses who substantiated that his father beat him, was having marital discord, and had been seen by one of them threatening appellant by putting a gun to his head. Appellant's specific defense to the charges of first degree murder was that his father had returned home in a drunken rage and forced appellant to kill the others. His father then made him clean the apartment. Later, in the car, his father again threatened him, but appellant was able to shoot his father. Appellant argued that the evidence supported this version of events since the blood-stained seats in the car matched only his father's blood type. The Commonwealth refuted this evidence by proving that the barrel of the murder weapon contained only the blood type which matched his stepmother, but not his father. Thus, appellant's stepmother rather than his father was the last one to be shot with that gun.

■ Appellant first argues that the trial court erred in denying his motion to suppress the letter to appellant's girlfriend on the basis that it was seized as a consequence of an improper warrantless search. Appellant contends that his apparent consent to the search was made under duress, and moreover, he never was provided with any alternative to impoundment. This was despite the fact that his automobile was not illegally parked or obstructing traffic, and he could have made alternate arrangements to having it impounded. In addition, he argues that the objective acts of the police indicate that their search of the automobile was investigatory rather than an inventory search to protect its contents. For example, the police seized only the letter and did not complete a thorough inventory until later. Furthermore, no exigent circumstances existed, and thus, the search violated his fourth amendment rights against unreasonable search and seizures. In support, appellant cites *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19, L.Ed.2d 576 (1967) (exclusionary rule precludes use of evidence obtained through an illegal search).

■ We begin by noting that the legality of the search of appellant's automobile is controlled by Tennessee law since that is where the search occurred. *See Commonwealth v. Harris*, 491 Pa. 402, 421 A.2d 199 (1980) (validity of search is governed by the law of the state where the search took place). We note that in *State v. Jacumin*, 778 S.W.2d 430 (Tenn.1989), the Supreme Court of Tennessee retained the two-prong test for probable cause for a search based on source of knowledge of criminal activity and the reliability of the knowledge, as espoused by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In so doing, Tennessee failed to adopt the totality of circumstances test set forth by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Finally, Tennessee has approved impoundment and inventory searches of automobiles only in circumstances set forth in written procedures pursuant to which police must demonstrate that there was no feasible alternative to their safeguarding the automobile, such as the owner making alternate arrangements or leaving the automobile where it was parked and locking it. *See Drinkard v. State*, 584 S.W.2d 650 (Tenn.1979).

Our standard of review for suppression issues is clear. In *Commonwealth v. Bruner*, 388 Pa.Super. 82, 89, 564 A.2d 1277, 1281 (1989), we recently stated:

> In reviewing a suppression court's denial of a motion to suppress, the appellate court's responsibility is to determine whether the record supports the factual findings of the suppression court and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1271 (1989). In making this determination, the reviewing court "will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Id.*, 521 Pa. at 438, 555 A.2d at

1271–72, quoting *Commonwealth v. Kichline*, 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976).

Instantly, evidence adduced at the suppression hearing revealed that the troopers followed the written regulations authorizing impoundment. It would not have been reasonable to assume that appellant, who was from Pennsylvania and had been placed under arrest for four homicides, could have made viable alternate arrangements or could have left the vehicle unattended in a privately-owned area for a lengthy period. Also, the troopers conducted only a quick preliminary check for valuables prior to towing the vehicle, and the letter was in plain view. Consequently, we conclude that the suppression court properly denied appellant's motion to suppress.

 Finally, it is beyond question that appellant's automobile would have been searched thoroughly after his arrest. The Supreme Court has upheld the introduction of evidence seized improperly where it can be established that it would have been discovered inevitably through an independent and uncorrupted source. The Supreme Court stated:

It seems to us, however, that reseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered. The independent source doctrine does not rest upon such metaphysical analysis, but upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one ... there is no reason why the independent source doctrine should not apply.

The ultimate question, therefore, is whether the search pursuant to a warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agent's decision to seek the warrant was prompted by what they had seen during the initial entry, or if informa-

tion obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 2535–36, 101 L.Ed.2d 472, 483–84 (1988) (footnote omitted). In the present case, we conclude that whatever the legitimacy of the original search, appellant's letter ultimately would have been discovered independently pursuant to an inventory search following appellant's arrest for murder and regardless of the earlier search. Therefore, the letter properly was admitted. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

 Next, appellant contends that the trial court erred in admitting color photographs of the bodies and photographs of his stepmother and brothers when they were alive. Appellant claims that these photographs were cumulative, not necessary to depict any facts at issue to the jury, and were inflammatory. Our standard of review is clear. Decisions regarding the admissibility of photographs are committed to the sound discretion of the trial judge and will not be reversed absent a showing that the trial court abused its discretion. *Commonwealth v. Liddick*, 471 Pa. 523, 370 A.2d 729 (1977); *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974). "[I]t is not for an appellate court to usurp the function of the trial court to balance the alleged prejudicial effect of the evidence against its probative value." *Commonwealth v. O'Shea*, 523 Pa. 384, 400, 567 A.2d 1023, 1030 (1989). In determining the admissibility of photographic evidence, the trial court first must determine whether the pictures are inflammatory. *Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990); *Commonwealth v. Liddick, supra.* If they are not inflammatory, they are admissible, provided that they are relevant and can assist the jury in understanding the facts. Even if the photographs are inflammatory, they are admissible if their evidentiary value clearly outweighs the likelihood that they will inflame the passions of the jurors.

■ Instantly, we agree with the trial court's reasoning that the challenged photographs of the bodies and the apartment were not inflammatory in that the wounds were not illustrated graphically. Furthermore, the photographs were relevant to explain the extent to which appellant meticulously cleaned the scene of the crime and how he attempted to hide the bodies of his victims. This bears not only on appellant's subsequent plan to evade the consequences of his acts but also on his own consciousness of guilt. *See Commonwealth v. Duffey*, 519 Pa. 348, 548 A.2d 1178 (1988) (photographs of victim and murder scene properly admitted to show the victim's injuries and to help the jury understand the murder scene).

■ Nor do we find that the admission of photographs of appellant's stepmother and brothers while alive constitutes error. The record demonstrates that admission of these photographs was not accompanied by the highly irrelevant and emotional testimony about the life the victims led, their character, reputation, or the loss that surviving relatives suffered, which are the bases upon which our supreme court overruled the admission of similar photographs in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978) (two photographs of victim with handicapped daughter embellished widow's testimony regarding his character and her loss). Also, the photographs were not sent out with the jury, and the jurors were instructed that the verdict must be based on the evidence, not passion or prejudice. Accordingly, the admission at worst was harmless. *Commonwealth v. Mehmeti*, 501 Pa. 589, 462 A.2d 657 (1983) (admission of wedding picture of victim at son's wedding was harmless where testimony was limited to identification and did not include a recitation of the victim's life).

■ Appellant's next argument is that counsel was ineffective for failing to object to improper closing argument by the prosecutor in which she appealed to the jury's emotion and referred to matters not in evidence. *See Commonwealth v. Watts*, 488 Pa. 214, 412 A.2d 474 (1980) (unwarranted failure to object to inflammatory closing remarks by

prosecutor constituted ineffective assistance of counsel and warranted the grant of a new trial). In reviewing appellant's claims of trial counsel's ineffectiveness, we are guided by a well-established standard, set forth by the supreme court in *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988):

> There are three elements to a valid claim of ineffective assistance. We inquire first whether the underlying claim is of arguable merit; that is, whether the disputed action or omission by counsel was of questionable legal soundness. If so, we ask whether counsel had any reasonable basis for the questionable action or omission which was designed to effectuate his client's interest. If he did, our inquiry ends. If not, the appellant will be granted relief if he also demonstrates that counsel's improper course of conduct worked to his prejudice, i.e., had an adverse effect upon the outcome of the proceedings. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967).

*Id.* 518 Pa. at 83, 541 A.2d at 318. Furthermore, counsel is presumed to be effective, and the appellant has the burden of proof in this respect. *Commonwealth v. McNeil*, 506 Pa. 607, 487 A.2d 802 (1985); *Commonwealth v. Grabowski*, 378 Pa.Super. 454, 549 A.2d 145 (1988).

Our review of the record indicates that appellant's underlying argument lacks merit. Appellant contends that the following remarks were improper and biased the jury against him by inflaming their passions and referring to matters not of record:

> You should be angry because you shouldn't treat a case where four people are dead as cavalier as [appellant and his counsel appear to] or is it that they didn't have their act together? Now, Ladies and Gentlemen, you think about that and you consider the fact that perhaps the defendant couldn't figure out, maybe he was thinking in

his mind how am I going to explain this letter. Because he had to come up with it at that point.

Why is it that they couldn't tell you who had killed [his father,] Catalino? Because the defendant hadn't come up with the little story that he gave you from that witness stand.

Notes of Testimony, 6/5/89 at 42–43. Appellant complains that not only does this argument improperly appeal to the jurors' emotions, but the prosecutor also improperly encouraged the jury to consider the prosecutor's impression of appellant's impassive demeanor throughout the trial when she stated that it demonstrated his apparent lack of remorse.

█ Comments by the prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Anderson*, 501 Pa. 275, 282, 461 A.2d 208, 211 (1983). We conclude from our review of the record that the remarks were not prejudicial but merely were arguments based on the evidence. Further, the trial court instructed the jurors that they should disregard the prosecutor's remarks concerning appellant's demeanor and consider only their own observations of him on the witness stand. As a result, we do not find unavoidable prejudice, especially when appellant's demeanor as observed by the jury is a proper consideration. *See Commonwealth v. Parente*, 294 Pa.Super. 446, 440 A.2d 549 (1982) (prosecutor properly commented on appellant's demeanor on the witness stand which readily was apparent to the jurors); *Commonwealth v. Sparks*, 351 Pa.Super. 320, 505 A.2d 1002 (1986) (demeanor is a relevant factor that the jury may consider in assessing a witness's credibility).

█ Appellant next argues that the trial court's instruction regarding the use of character evidence was incorrect and misleading to the jury. He contends that the charge was confusing, overemphasized the Commonwealth's cross-

examination, and negated the impact of the good character testimony. In support of this assertion, appellant argues that he is entitled to a clear instruction that community reputation in and of itself is enough to raise a reasonable doubt. *Commonwealth v. Neely,* 522 Pa. 236, 561 A.2d 1 (1989); *Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1975). Appellant declares that this instruction was mandated because the primary duty of a trial judge in charging a jury is to clarify the issues so that a jury may understand the questions to be resolved. *Commonwealth v. Litman,* 276 Pa.Super. 114, 419 A.2d 121 (1980). The pertinent portion of the instruction at issue reads as follows:

> The Assistant District Attorney called witnesses who testified that the defendant had taken a gun to school on one or two occasions and questioned some of the witnesses as to their knowledge about the gun. You may use the Commonwealth's evidence about the gun for one purpose only. That is to help you judge whether the defense's character witnesses are really familiar with the defendant's reputation and whether in their testimony they gave you an accurate description of his reputation. The law recognizes that a person of good character is not likely to commit a crime which is contrary to his nature. *Evidence of good character may by itself raise a reasonable doubt of guilt and justify a verdict of not guilty.* You must weigh and consider the evidence of good character along with the other evidence in the case and if on all of the evidence you have a reasonable doubt of the defendant's guilt you must find him not guilty.

Notes of Testimony, 6/5/89, at 91 (emphasis added).

Viewed in its context as a whole, we do not agree that this instruction is confusing or overemphasizes the Commonwealth's cross-examination of the character witnesses regarding the gun. It is well-settled that in reviewing a challenge to the jury charge, the charge must be viewed as a whole. *Commonwealth v. Grove,* 363 Pa.Super. 328, 526 A.2d 369 (1987). The trial court correctly limited the Commonwealth's cross-examination of appellant's character wit-

nesses to whether they knew that appellant carried a gun to school. The court instructed the jury that it was to consider this testimony only for the purpose of weighing the accuracy of the character witness testimony concerning appellant's reputation in the community. Furthermore, the instruction clearly comports with the requirements of *Neely*.

Appellant's final argument is that the court erred in denying his request to charge the jury that the possibility that another person committed these crimes is sufficient to raise a reasonable doubt as to his guilt. This instruction request was based on appellant's allegation that his father made him kill the others and then he killed his father. It is well-settled that a trial judge is not required to accept a requested jury instruction verbatim, even if it is legally correct, as long as the relevant point of law adequately is presented to the jury. *Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371 (1986). Instantly, the court instructed the jury that the Commonwealth did not have any burden to exclude the possibility that others committed the crime; however, such a possibility could be considered as raising reasonable doubt. It then instructed the jury that if it did not believe the possibility that someone else committed the crimes, it was to find appellant guilty. Although this is not the precise language that appellant requested, we find that it adequately and correctly conveyed the point that the possibility that someone else committed the crimes could raise a reasonable doubt as to appellant's guilt. "Where the charge properly covers the requested point, it is not error for the trial court to refuse to give additional instructions." *Commonwealth v. Grove, supra.*

Judgment of sentence affirmed.

MONTEMURO, J., files a concurring opinion.

WIEAND, J., joins in the majority opinion and the concurring opinion.

MONTEMURO, Judge, concurring.

While I agree with the analysis and conclusions reached by the majority, I feel it is important to recognize and address appellant's challenge to the validity of the Tennessee search warrant.

Appellant seeks to assert that his Fourth Amendment rights were violated as the search warrant, issued two (2) days after his arrest on March 26, 1988, was not supported by probable cause. Based upon this allegation, appellant concludes that all evidence seized from his automobile pursuant to the warrant should have been suppressed. This contention is without merit.

Initially, the law to be utilized in determining the validity of a search warrant, and our consequent standard of review on appeal, is governed by Tennessee law.[1] As set forth by the Tennessee Supreme Court,

> [t]he Fourth Amendment warrant requirement mandates a probable cause determination made by a neutral and detached magistrate. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 396, 92 L.Ed. 436 (1948). Where the determination is made by such a magistrate, it is entitled to "great deference" by a reviewing court. *The reviewing court's standard is whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.* (citations omitted).

*State v. Jacumin*, 778 S.W.2d 430, 432 (Tenn.1989) (emphasis added). " '[I]n passing on the validity of a warrant, the reviewing court may consider *only* the information brought to the magistrate's attention.' " *Id., citing Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964) (emphasis in original). And this information is to be contained in an affidavit of probable cause. *See Id., citing* Tenn.R.Crim.P., Rule 41(c). *See also Blackburn v. Fox*, 200 Tenn. 227, 292 S.W.2d 21 (1956) (It is from the contents

1. *See* Majority Opinion, *infra*, p. 158, *citing Commonwealth v. Harris*, 491 Pa. 402, 421 A.2d 199 (1980) (The validity of the search of appellant's automobile is controlled by Tennessee law.)

of the affidavit for search warrant that the magistrate determines the existence of probable cause). With these principles in mind, it must be determined whether the issuing magistrate had a substantial basis for concluding that there was probable cause.

As stated by the Court of Appeals for the Sixth Circuit in *United States v. Acklen*, 690 F.2d 70 (6th Cir.1982), the test for probable cause is

> ... whether *"the facts and circumstances within the officers' knowledge* and of which they had reasonably trustworthy information *are sufficient in themselves to warrant a man of reasonable caution in the belief"* that certain items are the fruits, instrumentalities, or evidence of crime and that these items *are presently to be found at a certain place.*

*United States v. Acklen*, 690 F.2d 70, 73 (6th Cir.1982), *citing Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (emphasis added).[2] The recitation of facts set forth in the affidavit must provide a nexus between the crime and the automobile to be searched so that one can reasonably conclude that the evidence is in the place sought to be searched. *State v. Longstreet*, 619 S.W.2d 97, 99 (Tenn.1981), *citing Whitley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565–566, [91 S.Ct. 1031, 1035–1036, 28 L.Ed.2d 306] (1971).

In the instant case, the Statement of Probable Cause, attached to the Affidavit, alleges the following facts:

2. To the extent that appellant relies on *State v. Jacumin, supra,* for the test for probable cause, he is incorrect. In *Jacumin,* the basis of the affidavit of probable cause was information provided by a confidential informant. In determining whether there was probable cause, the Tennessee Supreme Court utilized the two-prong test as espoused in *Aguilar v. Texas, supra* and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) to determine the credibility and veracity of the information provided by the confidential informant in support of probable cause. The facts and circumstances of the instant appeal mandate a different test as all information provided in the affidavit was pursuant to police investigation. Therefore, we utilize the standard as set forth in *Acklen, supra.*

1) On March 21, 1988, at approximately 9:35 a.m., the bodies of four (4) people were discovered in Philadelphia, Pennsylvania;

2) These bodies were the father, step-mother and two (2) step-brothers of Jose Enrique Hernandez (appellant herein);

3) Jose Enrique Hernandez was seen going in and out of the house in which the bodies were discovered the entire week of March 14, 1988 thru March 21, 1988, the date the bodies were found;

4) Based upon this information, a Pennsylvania Arrest Warrant was obtained for Jose Enrique Hernandez, alleging four (4) counts of murder;

5) On March 24, 1988, at approximately 1:30 a.m., Jose Enrique Hernandez was taken into custody by Tennessee State Trooper Deal, after Trooper Deal observed Hernandez acting suspiciously while resting at Reed's Truck Stop in Dickson County, Tennessee;

6) Due to Hernandez's suspicious behavior, Trooper Deal entered the license plate on Hernandez' automobile and found out that the occupant of the vehicle was wanted on four (4) counts of murder;

7) Based on the above information, plus the fact that the evidence sought [i.e. blood samples, or bloody clothing/rags, .22 caliber ammunition (affiant knows that the murder weapon used was a .22 caliber pistol), or any notes, writing, or papers in relation to the four murders on or about March 14, 1988] was not found in the Philadelphia residence of the victims, the affiant believed there was probable cause to search the automobile which Hernandez was driving.

*See* "Affidavit and Search Warrant for Evidence of Crime" and "Statement of Probable Cause" attached thereto. After reviewing these facts and circumstances, it is not unreasonable to conclude that the items sought, since *not* present in appellant's home in Philadelphia, *might* be present in the car which appellant utilized to drive from Pennsylvania into Tennessee. *See United States v. Hatfield*, 599 F.2d 759,

762 (6th Cir.1979), *citing United States v. Hodge*, 539 F.2d 898, 903 (6th Cir.1976), *quoting Brinegar, supra* 338 U.S. at 175, 69 S.Ct. 1302, 93 L.Ed. 1879 ("In dealing with probable cause ... as the very name implies, we deal with probabilities.") Given the facts of the Affidavit, and as commonsense dictates that there was a probability that the items might be in the automobile, the magistrate had a substantial basis for issuing the search warrant. *See Id.* at 762, *citing United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) (Where a recitation of the underlying circumstances in the affidavit are detailed, and where the magistrate has found probable cause, the courts should not interpret the validity of a warrant other than by a commonsense analysis.) Therefore, appellant's assertion that his Fourth Amendment rights were violated is without merit.

WIEAND, J., joins.