**Commonwealth v. Croll**

*Michael P. McIntyre, assistant district attorney*, for the Commonwealth.

*Charles E. Sieger, Jr.,* for defendant.

DIEFENDERFER, *P.J.,* December 10, 1993—The defendant, David Croll, was charged with first degree murder in the October 29, 1986 shooting death of Candie Moyer. He was found guilty of first degree murder on March 4, 1988 by a jury and a sentencing of life imprisonment was imposed by the jury immediately thereafter.[1] The defendant was originally scheduled to be sentenced by the court on April 4, 1988. Sentencing did not take place at the time due to the defendant's filing of post-trial motions in the form of a motion for a new trial and a motion for arrest of judgment. Sentencing has yet to take place. The defendant's post-trial motions were filed on March 14, 1988. However, his brief in support of his post-trial motions was not filed until May 27, 1992. The Commonwealth filed their brief in opposition on June 18, 1992. Argument in respect to said post-trial motions was held on July 15, 1992 wherein the court was advised that the post-trial motions were going to be submitted and argued on brief.

On October 29, 1986 at about 7:00 P.M. the defendant shot and killed the victim, Candie Moyer, while she was sitting in her car at her place of employment at the Emmaus Auto Parts store in Emmaus, Pa. The victim was shot six times at a close range, two shots in the head, two shots in the chest, one shot in the leg and one shot in the left shoulder. The victim was the estranged fiancee of the defendant, the victim having broken off the engagement the preceding September.

---

1. The Commonwealth was not seeking the death penalty.

The evening before, on October 28, 1986, the victim had gone out with other friends to a local restaurant known as the Fairgrounds Hotel and while she was there the defendant asked the victim to talk outside, which she did. The victim returned to her friends and she was very upset and had told her friends she was in fear of her life. On October 29, 1986 the defendant also appeared upset at work and left work early and returned to his home. Shortly thereafter, the defendant attempted to get hold of the victim and was unable to do so. The defendant, knowing where the victim would be working, went to her place of employment and shot the victim as heretofore stated. The issue of the defendant shooting the victim was never disputed.

Shortly after the defendant shot the victim, the defendant made a call home and talked to his father and said "I thought I had shot Candie." The father thereupon called the local police and at that time the defendant's whereabouts were unknown. At or about 7:30 that evening, the defendant called his home and told his father he was located in Easton, Pa. Again, his exact whereabouts were unknown. At or about 8:30 P.M., he again called home and told his father that he was at the Campus Motel in Kutztown, Pa. This information was relayed to the local police and the local police then made efforts to apprehend the defendant. While the defendant was in Kutztown, Pa., he stopped into a local variety store and purchased a small amount of paint and altered his license plate. The defendant was then later apprehended by the local police at the Campus Motel. He attempted to elude the police at that time but was cut off by the police and apprehended. The gun in question was located in the defendant's motor vehicle.

The defendant was thereafter arrested for criminal homicide (18 Pa.C.S. §2501) and an information to

that effect was filed by the district attorney of Lehigh County on February 4, 1987. The district attorney, although seeking a conviction of first degree murder, was not asking for the death penalty in this case.

This court will only consider those issues briefed and/or argued by the defendant. All other issues raised in his post-trial motions will be deemed to have been waived. *Commonwealth v. Williams,* 476 Pa. 557, 383 A.2d 503 (1978).

The defendant's first contention is that the court erred in not allowing defendant's experts, Dr. Gerald Cooke and Dr. Robert Sadoff, to testify relying upon a hypnotic session with the defendant as to his state of mind on the date of the shooting.

The defendant asserts that he was temporarily insane when he shot the victim. Further, he alleges that he now suffers from some form of amnesia as to the events of that day and as to the shooting itself. The defendant sought to introduce the testimony of these two experts, Dr. Sadoff and Dr. Cooke, to testify to the defendant's state of mind on the day of the shooting. Namely, the experts were to render an opinion on whether the defendant suffered some form of diminished capacity or if he was legally insane under the *M'Naughten Rule.*[2]

Specifically, Dr. Cooke is a forensic psychologist who was hired by the defense to perform a psychological evaluation of the defendant to determine what state of mind the defendant was in on the day of the shooting.

---

2. Under [the] *M'Naughten Rule* [test for insanity], a defendant is legally insane and absolved of criminal responsibility if, at the time of committing the act, due to a defect of reason or disease of mind, the accused either did not know the nature and quality of the act or did not know the act was wrong. *Commonwealth v. Heidnik,* 526 Pa. 458, 587 A.2d 687 (1991).

Dr. Cooke was prepared to testify at trial regarding the defendant's capacity to form a specific intent to kill but could not state an opinion as to whether or not the defendant was legally insane under *M'Naughten*. However, Dr. Cooke stated that if he were able to view the videotape of the defendant's hypnotic session he might be able to offer an opinion regarding the insanity of the defendant on the day of the shooting. Dr. Cooke was precluded from viewing the tape or relying on the hypnotic session, and did not testify.

Dr. Sadoff is a psychiatrist who was present during the defendant's hypnotic session. Dr. Sadoff testified in camera that if he were not able to rely on the videotape during his testimony then he would be unable to render an opinion on the defendant's state of mind during the shooting. Since the court did not permit the use of the videotape and hypnotic session in any capacity, Dr. Sadoff did not testify.

The Pennsylvania Supreme Court has stated that testimony adduced by hypnotism is inadmissible as evidence. *Commonwealth v. Smoyer,* 505 Pa. 83, 476 A.2d 1304 (1984). It has been held that two important characteristics of a subject in a hypnotic trance are: hypersuggestibility and hypercompliance. *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981). A subject's awareness of the purpose of the hypnotic session, coupled with the hypersuggestibility which the subject experiences, amounts to a situation fraught with unreliability. *Id.*

The majority of Pennsylvania cases dealing with hypnosis are in the area of witness testimony. These cases have held that a witness who was hypnotized may only testify to that information which was stated prior to the hypnosis. The witness cannot testify as to any facts or information adduced from the hypnosis itself. See

*Commonwealth v. Smoyer, supra* (a witness, after hypnosis, was only able to recall the jolt administered by the defendant which allegedly resulted in the victim's death); *Commonwealth v. Romanelli,* 336 Pa. Super. 261, 485 A.2d 795 (1984), *alloc. granted,* 520 Pa. 603, 553 A.2d 966 (1988), *aff'd,* 522 Pa. 222, 560 A.2d 1384 (1989) (rape victim who possessed a clear, independent, mental image of her assailant's appearance was not rendered incompetent to testify because in the interim she subjected herself to non-suggestive hypnosis); *Commonwealth v. Mehmeti,* 347 Pa. Super. 278, 500 A.2d 832 (1985) (portion of testimony which had not been included in prehypnotic statement was inadmissible); *Commonwealth v. McCabe,* 303 Pa. Super. 245, 449 A.2d 670 (1982); *Commonwealth v. Taylor,* 294 Pa. Super. 171, 439 A.2d 805 (1982).

The defense relies on the United States Supreme Court case of *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) in asserting that the court erred in refusing to allow the defense experts to testify relying on the videotape of the hypnotic session. However, upon a careful review of *Rock,* we find that it is readily distinguishable from the case at bar.

In *Rock,* the defendant was charged with the shooting of her husband. In order to refresh her memory as to the shooting, she underwent two hypnotic sessions with a trained nueropsychologist. After hypnosis, she remembered more specific details about the shooting which the Arkansas trial court would not allow in holding that hypnotically refreshed testimony was per se unreliable. The United States Supreme Court granted certiorari to determine if a "criminal defendant's right to testify may be restricted by a state rule that excludes her post-hypnosis testimony". The court held that "hypnotically enhanced testimony is [not] always so un-

trustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial". *Id.* at 61, 107 S.Ct. at 2714, 97 L.Ed.2d at 52.

*Rock* dealt with the right of a defendant to testify regarding posthypnotic memory while the case at bar deals with the right of defense experts to render an opinion on the defendant's state of mind in reliance on the defendant's videotaped hypnotic session. The situations in the two cases are distinguishable. *Rock* has no bearing on the case at bar since the defendant does not claim his right to testify regarding posthypnotic memory was violated. The defendant did not testify as to what he remembered about the shooting which was revealed during the hypnotic session. Further, he did not try to testify regarding those events nor was an objection made by the Commonwealth regarding its admission at trial. What we have before the court are two defense experts who stated they could not render an opinion on the defendant's state of mind unless they were allowed to rely on the videotape.

The situation present in the pending case is apposite to that found in *Commonwealth v. Reed,* 400 Pa. Super. 207, 583 A.2d 459 (1990), *alloc. denied,* 528 Pa. 629, 598 A.2d 282 (1991). In *Reed,* the defense sought to introduce a videotape of his hypnotic interview and to have his expert testify with the help of the videotape. The trial court ruled that the tape could not be shown to the jury and the expert could not rely on it during his testimony on the basis that the hypnotic session was scientifically unreliable.[3] The court noted that:

---

3. The leading case in establishing the standard by which admissibility of scientific evidence must be judged is *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). In *Frye,* the court explained: "Just when a scientific principle or discovery crosses the line between

"Declarations made under hypnosis have been treated judicially in a manner similar to drug-induced statements. The hypnotized person is ultrasuggestible, and this manifestly endangers the reliability of his statements. The courts have recognized to some extent the usefulness of hypnosis, as an *investigative technique and in diagnosis and therapy.* However, they have rejected confessions induced thereby, statements made under hypnosis when offered by the subject in his own behalf, and opinion as to mental state based on hypnotic examination." (emphasis added) *Id.* at 227, 583 A.2d at 468; citing, *Commonwealth v. Greenfield,* 214 Va. 710, 240 S.E.2d 414, 92 A.L.R.3d 432 (1974).

This is the situation in the case at bar. It also must be noted that the trial court viewed the videotape in camera and noted many inconsistencies between what the defendant was asserting and to undisputed facts. The trial court was convinced as to its unreliability and the prejudice such videotape would introduce.

The defendant was precluded from showing the videotape to the jury and from having his defense experts rely on it in rendering their opinion. Based on these exclusions, the defense experts were unable to testify at trial. However, the court ruled that the videotape

---

the experimental and demonstrable stages is difficult to define ... [W]hile courts will go a long way to admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs". *Frye,* 293 F. at 1014. While the [Pennsylvania Supreme] Court conceded the usefulness of hypnosis as a "powerful medical technique", it expressed serious reservation about the forensic use of hypnosis to establish facts. *Commonwealth v. Reed,* 400 Pa. Super. 207, 583 A.2d 459, 469 (1990), *alloc. denied,* 528 Pa. 629, 598 A.2d 282.

of the hypnotic session was inadmissible since it was scientifically unreliable and should not be used to influence guilt or innocence. (N.T. vol. I pp. 14-16.) The defendant cannot make use of statements made during the hypnotic session when offered by the defense experts to render an opinion as to state of mind. Therefore, the videotape of the hypnotic session was properly excluded.

The defendant's second contention is that the court erred in permitting various police officers to give an opinion as to the defendant's mental capacity and mental condition. Specifically, the defense objected to Officer Keiser (retired) and Trooper Kohuth's[4] rendering of lay opinions regarding defendant's mental state shortly after his arrest.

It has been held that the Commonwealth can prove an accused's sanity not only by psychiatric testimony but also by lay testimony which shows that he or she knew the nature and the quality of the act committed and knew that what had been done was wrong. *Commonwealth v. Frisoli,* 277 Pa. Super. 396, 419 A.2d 1204 (1980). "[E]vidence on a defendant's mental condition can just as credibly come from the testimony of lay witnesses 'concerning the defendant's actions, conversations, and statements at the time of the killing from which the jury could find that he knew what he was doing when he killed and knew it was wrong.'" *Commonwealth v. Ruth,* 309 Pa. Super. 458, 462, 455 A.2d 700, 702 (1983).

---

4. We note that the defendant also objected to Trooper Levinsky's testimony as improper lay opinion. However, Trooper Levinsky did not state an opinion as to the defendant's mental state. His testimony was limited to the events which occurred while performing his duties as a Pennsylvania State Trooper. See N.T vol. I pp. 207-219.

The officers, in the case at bar, offered lay testimony regarding the defendant's mental state only after they had observed the defendant for anywhere from one and a half to three hours. More specifically, Officer Keiser, who was a police officer with twenty-three years experience, personally guarded and observed the defendant for a period of three hours shortly after his arrest. The period of time involved was from approximately 11:00 P.M. to 2:00 A.M. (N.T. vol. I pp. 147-49, 155-56.) Trooper Kohuth, who has been a Pennsylvania State Trooper for ten years, observed the defendant for approximately one and a half to two hours while transporting him back to Emmaus, Pa. from Kutztown, Pa. (N.T vol. I pp. 191, 194-95.) Both officers testified that they have had experience in dealing with mentally impaired people and that in their opinion the defendant did not exhibit any unusual behavior and knew exactly what he was doing and why he was there. (N.T vol. I pp. 147-49, 194-95.)

The defendant was able to cross-examine the officers as to their observations. Further, the defense was permitted to cross-examine the officers as to any experiences they may have had in dealing with mentally impaired people. However, the defense was not permitted to cross-examine the officers as to what knowledge they may have had as to mental illness and disease. The attempted questioning was objected to by the Commonwealth and was sustained by the court who noted that the officers were not offering an expert opinion but only a lay opinion. (N.T vol. I p. 197.)

The officers, Keiser and Kohuth, gave permissible lay opinion testimony regarding their observations of the defendant shortly after his arrest and the court did not err in permitting such testimony.

The defendant's third contention is that the court erred in refusing to suppress certain statements made

to officers after *Miranda* rights were given. A suppression hearing was held before the Honorable John E. Backenstoe. Judge Backenstoe filed his order and opinion on September 14, 1987 partially granting the motion.

One of the partially suppressed statements deals with a conversation between the defendant and Officer Frank Taylor of the Borough of Emmaus Police Department. The conversation states in pertinent part:

"Defendant—What was she like?

"Taylor—What do you mean?

"Defendant—What did she look like?

"Taylor—You mean, Candie, I'm not trying to avoid your question. I don't know what you mean. Do you mean where did you shoot her?

"Defendant—Yes.

"Taylor—I saw one shot in her head but I can't tell at this time where the others are."

The court suppressed all statements made by the defendant after he asked Officer Taylor, "What did she look like?"

However, Article 1, §9 of the Pennsylvania Constitution was amended in 1984 to provide: "the use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself." *Commonwealth v. Daniels*, 531 Pa. 210, 226, 612 A.2d 395, 403 (1992). The purpose of such a rule is to preclude an accused from lying with impunity when he takes the stand at trial, merely because a voluntary statement he made before trial was suppressed. *Id.*

The defendant took the stand at trial and testified in his own behalf. During his testimony, he related

the conversation he had with Officer Taylor. (N.T vol. V p. 998.) The defendant voluntarily recalled this conversation with the officer even though the court had suppressed relevant portions of the statement. The Commonwealth, over the objection of the defense, cross-examined the defendant as to the accuracy of the statement. (N.T. vol. V pp. 1188-93.) The Commonwealth then recalled Officer Taylor as a rebuttal witness to impeach the testimony of the defendant regarding the above statement. (N.T vol. VI pp. 174-75.)

It was permissible for the prosecution to introduce the suppressed statements after the defendant opened the door by testifying to it during his direct examination. Therefore, the court did not err in permitting the use of the statement during trial.

The defendant also alleges that certain other statements should have been suppressed and were improperly admitted at trial. However, in reliance on this court's opinion dated September 14, 1987, we find that the statements were properly admitted at trial.

The defendant's fourth contention is that the court erred in refusing to suppress the gun found by police in his vehicle. Again, this issue was addressed at the suppression hearing and in the court's opinion dated September 14, 1987. In reliance on the stated opinion, we find that the use of the gun was proper at trial.

The defendant's fifth contention is that the court erred in denying defendant's motion for a change of venire. This issue was addressed in an omnibus pretrial motion for a change of venire. The court signed an order and opinion denying the motion on December 9, 1987. For reasons set forth in the opinion denying the motion, we find that the court did not err in denying the motion for a change of venire.

The defendant's sixth contention is that the court erred in overruling defense counsel's objections to audible comments made by the Commonwealth in their opening statement and during trial. In particular, defendant objects to the Commonwealth's comments of "darn right" and of "not being a choirboy".

It has been held that during the course of a trial, "some statements [may] not [be] made as a result of good judgment, but not every unwise statement warrants [a] reversal. ... The effect of such remarks depends upon the atmosphere of the trial and the proper action to be taken is within the discretion of the trial court." *Commonwealth v. Council,* 355 Pa. Super. 442, 446-447, 513 A.2d 1003, 1005 (1986), *alloc. denied,* 519 Pa. 664, 548 A.2d 353 (1988), citing *Commonwealth v. Hernandez,* 498 Pa. 405, 446 A.2d 1268 (1982); See *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975).

During defendant's cross-examination, the Commonwealth asked him:

"Just so we can establish you are not quite a choirboy; you would agree with me, wouldn't you?"

The question was objected to by defense counsel and sustained by the court. (N.T vol. V p. 1013.)

The second comment the Commonwealth allegedly made was "darn right" in response to defendant's comment that Candie's death would affect him for the rest of his life. This comment was allegedly overheard by defense counsel but was not brought to the attention of the court until after the lunch recess. (N.T. vol. V p. 999.) The defense counsel was sitting approximately three feet away from the Commonwealth's table when the remark was supposedly overheard. The judge who was sitting approximately fifteen feet away from the Commonwealth's table did not overhear any such re-

mark. Further, it is unknown if the jury, who was also sitting approximately fifteen feet away from the Commonwealth's table, ever overheard such a remark. (N.T. vol. V p. 999.)

The defendant was not unduly prejudiced by the choirboy comment as his objection to the remark was sustained by the court. Further, it is not even known if the jury overheard the Commonwealth's remark of "darn right". Therefore, no undue prejudice can be said to have stemmed from such a remark.

The defendant's next contention is that the court erred in allowing a mug shot taken on October 29, 1986 to be shown to the jury and in allowing the Commonwealth to question defendant concerning previous crimes not involving crimen falsi.

"Evidence of prior crimes, though generally inadmissible, may be admitted if relevant to prove something other than a defendant's propensity for committing crimes. ... One exception to the general prohibition is that the Commonwealth may introduce evidence tending to show prior offenses if the purpose is to rebut statements which create inferences favorable to the [defense]," *Commonwealth v. Saxton,* 516 Pa. 196, 207, 532 A.2d 352, 357 (1987). Evidence of a prior bad act is admissible in rebuttal to dispel false inferences raised by the defendant or the defendant's witness. *Commonwealth v. Powers,* 395 Pa. Super. 231, 577 A.2d 194 (1990).

The defendant, in the case at bar, introduced evidence of his good character and reputation. He had defense witnesses testify to it. Namely, his mother testified that he did not use drugs (N.T. vol. III p. 621), and the defendant, in his opening and on direct examination, indicated that he did not have a criminal record and was never arrested for any felonies or misdemeanors.

(N.T. vol. I pp. 77-8; vol. V p. 912.) In addition, the defense indicated that they had witnesses who would testify as to the reputation of the defendant. (N.T. vol. IV p. 775.) This reputation evidence was admitted over the objection of the Commonwealth.

The Commonwealth, during defendant's cross-examination asked him if he had ever been arrested for anything other than a felony or misdemeanor. The defendant indicated that he had been. The Commonwealth then started to question the defendant as to what illegal acts he had committed. Defense counsel started to object to this line of questioning but withdrew the objection. (N.T. vol. V pp. 1010-11.) The Commonwealth proceeded to bring out on cross-examination the defendant's past criminal conduct and bad acts. In particular, it was revealed that the defendant was convicted of a summary offense, that he had smoked marijuana, had engaged in underage drinking and reckless driving.

The defendant's prior bad acts and criminal activity were not raised to show that he had a propensity to commit the act with which he was charged but rather they were brought out to rebut the inference that he was never arrested and had never used drugs. The use by the Commonwealth was permissible to rebut the favorable inferences raised by the defendant. Therefore, the court did not err in allowing evidence of the defendant's prior bad acts and offenses to be used by the Commonwealth.

The defendant also alleges that the court erred in allowing the Commonwealth to use a mug shot of the defendant taken in conjunction with this case. In Pennsylvania, the law is clear that if a testimonial reference to a photograph indicates to the jury the accused has been involved in prior criminal activity, reversible error is committed. *Commonwealth v. Turner,* 454 Pa. 439, 311 A.2d 899 (1973).

In the case at bar, the photograph admitted into evidence and shown to the jury was one taken of the defendant on the day of his arrest for the instant offense. The purpose of the admission and showing of the photograph was to allow the jury to see what he looked like at the time of the shooting in contrast to how he looked at the time of trial. Therefore, the photograph did not indicate to the jury that the defendant was involved in prior criminal activity and the court did not err in allowing it to be shown to the jury.

The defendant's seventh contention is that the court erred in permitting the use of a photograph of the victim, Candie Moyer, with her dog which had no probative value. Generally in Pennsylvania, the testimony regarding a victim's family status is inadmissible since such evidence has no probative value, is irrelevant and prejudicial. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). However this is not always the case.

In *Commonwealth v. Hernandez,* 404 Pa. Super. 151, 590 A.2d 325 (1991), *alloc. denied,* 529 Pa. 617, 600 A.2d 534 (1991), the appellant was charged with the murder of his father, stepmother and two younger brothers. At trial, the court admitted into evidence photographs of his stepmother and brothers which were taken while they were still alive. The Pennsylvania Superior Court held that:

"The record [indicates] that [the] admission of these photographs was not accompanied by the highly irrelevant and emotional testimony about the life the victims led, their character, reputation or the loss that surviving relatives suffered, which are the bases upon which our [Pennsylvania] supreme court overruled the admission of similar photographs in *Commonwealth v. Story, [supra]. ...* Also, the photographs were not sent out with the jury, and the jurors were instructed that the

verdict must be based on the evidence, not passion or prejudice. Accordingly, the admission at worst was harmless [error]." *Id.* at 161, 590 A.2d at 330.

The use of the photographs in *Hernandez, supra,* is similar to that in the case at bar. In the present case, a picture of Candie was identified by her mother. No testimony regarding Candie's reputation, her family life or her character were elicited from her mother during her testimony. (N.T. vol. III pp. 601-610.) The picture was admitted into evidence and allowed to be shown to the jury one time; however, the picture was not sent out with the jury during their deliberations. Therefore, no error resulted in the court's admission of the photograph.

The defendant's eighth contention is that the court erred in permitting the jurors to be asked during voir dire if they think someone is crazy just because he killed his girlfriend.

The single goal in permitting questioning of prospective jurors is to provide the accused with a competent, fair, impartial and unprejudiced jury. *Commonwealth v. Hathaway,* 347 Pa. Super. 134, 500 A.2d 443 (1985). The scope of voir dire rests in the sound discretion of the trial judge and his or her discretion will not be reversed unless palpable error is established. *Id.* It is in the trial court's discretion to preclude questions probative of prospective juror's attitudes toward the insanity defense. *Id.* Further, it is now well settled law in Pennsylvania that a trial court's refusal to permit the accused to question prospective jurors on voir dire about the juror's views of the insanity defense or their potential prejudice against the defense will not constitute palpable error warranting a new trial. *Commonwealth v. Trill,* 374 Pa. Super. 549, 543 A.2d 1106 (1988), *alloc. denied,* 522 Pa. 603, 562 A.2d 826 (1989).

In the instant matter, the court permitted the Commonwealth to question jurors about any opinions they may have had regarding the insanity defense. In particular, the Commonwealth was permitted to question the jurors if they believe a boyfriend is crazy if he kills his girlfriend. The purpose of this line of questioning was to provide the defendant with a fair, competent, impartial and unprejudiced jury. At the time of voir dire the Commonwealth was faced with the defense of insanity. See Pa.R.Crim.P. 305(c)(1)(b). Notice was filed May 1, 1989. No ruling had as yet been made as to the hypnotic videotape or the allowability of defendant's experts to testify in that regard. Therefore, the court did not err in allowing this line of questioning at voir dire.

The defendant's ninth contention is that the court erred in allowing the Commonwealth's expert, Dr. Timothy Micals, to express an opinion without requiring that the report be submitted to the defense pursuant to the court's order.

Dr. Timothy Micals was permitted to testify and render an opinion regarding the defendant's state of mind on the day of the shooting. See N.T. vol. VI pp. 1224-26. It is important to note that Dr. Micals did not prepare a report which was the reason the Commonwealth did not offer one to the defendant.

In *Commonwealth v. Kelly,* 365 Pa. Super. 28, 528 A.2d 1346 (1987), *alloc. denied,* 517 Pa. 598, 535 A.2d 1057 (1987), an expert testified to the appellant's blood alcohol content at the time of the accident. The defendant alleges that the Commonwealth violated Pa.R.Crim.P. 305(B)(1)(e) by not having the expert prepare a report and deliver it to defense counsel. While the defendant was notified that the expert would be called to testify, he objected to this testimony by stating that the Com-

monwealth should have had the expert prepare a report that the defense could look at.

The court in *Kelly, supra,* held that:

"[Pa.R.Crim.P.] 305(B)(1) requires the Commonwealth to disclose to defense counsel, 'results or reports of scientific tests, expert opinion, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant, which are within the possession or control of the attorney for the Commonwealth.' This rule only requires the Commonwealth to disclose written reports 'in their possession.' In the instant action, the Commonwealth could not have acted in contravention of Rule 305 as it had nothing to turn over." *Id.* at 38, 528 A.2d at 1350.

In the instant matter, Dr. Micals did not prepare a report which could have been given to the defendant. However, the defendant was aware of the doctor as he partially examined him. See N.T. vol. VI pp. 1224-26; order of the court dated December 7, 1987. As Dr. Micals did not even prepare a report which could have been delivered to the defense, no violation of Rule 305(B)(1)(e) occurred. Therefore, the court did not err in permitting Dr. Micals to testify.

The defendant's tenth contention is that the court erred in permitting inadmissible hearsay testimony which statements did not qualify as excited utterances or present sense impressions. Namely, the defendant alleges that it was error for the court to allow Officer Richard Peckelun to testify to statements made by the defendant's father and sister and to allow Commonwealth witnesses to testify to what Candie Moyer said on the day of the shooting.

"Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ... [It] is generally inadmissible as evidence because the competency and

veracity of the original speaker are not subject to examination." (citations omitted) *Commonwealth v. Underwood,* 347 Pa. Super. 256, 259, 500 A.2d 820, 822 (1985).

In the case of *Commonwealth v. Dean,* 300 Pa. Super. 86, 445 A.2d 1311 (1982) which relies on *Commonwealth v. Sanders,* 260 Pa. Super. 358, 394 A.2d 591 (1978), the Pennsylvania Superior Court has held that:

"[In *Sanders,* [*supra*] a police officer testified as to whom] the victim ... identified as the perpetrators. ... However, we believe it was not error to permit this testimony. The declarant was present in court and could have been examined by defense counsel and the jury could have observed her demeanor as she answered questions. ... *The principle reason for excluding hearsay is the danger that the declarant's credibility cannot be assessed. That danger was not present here.*" (emphasis in original) *Id.* at 89, 445 A.2d at 1312.

In the case at bar, Officer Peckelun testified to statements made to him by the defendant's father and sister. The Officer was present in the defendant's home when the defendant called his father from the motel in Kutztown, Pa. (N.T. vol. I pp. 164-71.) During the officer's testimony, the defendant's father was present in the courtroom. (N.T. vol. I pp. 158-64.) Additionally, the defendant's father and sister took the stand and testified on behalf of the defendant. The jury was able to assess their credibility and demeanor at the time they testified. Therefore, the court did not err in allowing Officer Peckelun to testify to what the defendant's father and sister told him.

The court did not err in allowing the Commonwealth witnesses to testify as to what Candie Moyer told them

the day she was killed. More specifically, "in order to preserve [the hearsay] issue, it is necessary [for the defendant] to identify [not only the witnesses but] the specific statements that are objected to." *Commonwealth v. Colson,* 507 Pa. 440, 464, 490 A.2d 811, 823 (1985); See *Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234 (1982).

In *Commonwealth v. Colson, supra,* the appellant, in his post-trial motions, identified witnesses who allegedly have hearsay testimony but he did not identify the statements which were allegedly inadmissible. In the case at bar, the defendant alleges that the Commonwealth witnesses testsified to what Candie Moyer said on October 29, 1986. However, the defendant fails to identify which witnesses and what specific statements. Without knowing the above factors, this court refuses to speculate as to what statements and witnesses the defendant finds objectionable. Therefore, the court did not err in admitting allegedly inadmissible hearsay testimony.

For the reasons set forth above, the defendant's motion for a new trial and/or arrest of judgement is denied.

## ORDER

Now, December 10th, 1993, upon consideration of defendant's, David Croll, post-trial motions in the form of a motion for new trial and a motion for arrest of judgment, it is hereby ordered that the defendant's post-trial motions are denied.

It is further ordered and directed that said defendant shall appear for sentencing on Monday, December 20, 1993 at 1:30 P.M., Courtroom No. 3A, Lehigh County Courthouse, Allentown, Pa.